**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LINDA GILES; WILLIAM GILES;
YERINGTON FORD, INC.,
          *Plaintiffs-Appellants,*

          v.

GENERAL MOTORS ACCEPTANCE
CORPORATION,
          *Defendant-Appellee.*

No. 05-15189

D.C. No.
CV-03-00147-LRH

BILL GILES MOTOR COMPANY, INC.;
LINDA GILES; WILLIAM GILES,
          *Plaintiffs-Appellants,*

          v.

GENERAL MOTORS ACCEPTANCE
CORPORATION,
          *Defendant-Appellee.*

No. 05-17251

D.C. No.
CV-04-00567-
LRH/VPC

OPINION

Appeals from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
January 9, 2007—San Francisco, California

Filed August 10, 2007

Before: Alfred T. Goodwin, A. Wallace Tashima, and
William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

9563

**COUNSEL**

Joseph M. Terry, Williams & Connolly, Washington, D.C., for the appellants.

Rick R. Hsu, Reno, Nevada, Michael E. Malloy and Christopher Damian Jaime, Maupin Cox & LeGoy, Reno, Nevada, for the appellee.

## OPINION

W. FLETCHER, Circuit Judge:

These are consolidated appeals in two diversity actions brought under Nevada law. In No. 05-15189, the "Yerington Ford case," Appellants Yerington Ford, Linda Giles, and William Giles sued General Motors Acceptance Corporation ("GMAC"). In No. 05-17251, the "Giles Chevrolet case," Appellants Bill Giles Motor Company ("Giles Chevrolet"), Linda Giles, and William Giles sued GMAC. In the discussion that follows, we sometimes use the term "Appellants" to refer to the appellants in one or the other of the cases and sometimes to refer to the appellants in both cases. Where the meaning is not clear from the context, we specify the appellants to whom we refer.

In the Yerington Ford case, the district court granted summary judgment to GMAC on the merits in a published opinion. *Yerington Ford, Inc. v. Gen. Motors Acceptance Corp.*, 359 F. Supp. 2d 1075 (D. Nev. 2004). In the Giles Chevrolet case, the district court granted summary judgment to GMAC, based on preclusion stemming from its decision in the Yerington Ford case, in an unpublished order.

We reverse both decisions and remand for further proceedings. In the Yerington Ford case, we hold that the district court misapplied Nevada's economic loss doctrine. In the Giles Chevrolet case, we hold that the district court misapplied Nevada's preclusion law.

## I. Background

William and Linda Giles ("the Gileses") own and operate two car dealerships, Yerington Ford and Giles Chevrolet, located in Yerington, Nevada. Each dealership had a "floor-plan financing" agreement with GMAC.

Under a floorplan financing agreement, GMAC finances a dealership's wholesale purchase of vehicles; the dealership displays the vehicles and makes monthly interest payments to GMAC; and the dealership repays GMAC the portion of the loan attributable to an individual vehicle when that vehicle is sold or leased. As part of a floorplan financing agreement, GMAC enters into a "wholesale security agreement" under which GMAC's loan is secured by the dealership's entire inventory of vehicles. GMAC has the right under the agreement to inspect the vehicles and the dealership's books and records at any time. If the dealership fails to pay off the portion of the loan attributable to an individual vehicle "faithfully and promptly" after the vehicle is sold or leased, GMAC has the right to take possession of all vehicles remaining in inventory "without demand or further notice and without legal process."

In 1992, shortly after its founding, Giles Chevrolet entered into a floorplan financing agreement with GMAC. In 1997, the Gileses purchased the dealership that became Yerington Ford. A year later, in 1998, Yerington Ford entered into a floorplan financing agreement with GMAC for the purchase of Ford vehicles. Under its prior owner, Yerington Ford had obtained its financing from the Ford Motor Credit Corporation. Yerington Ford switched to GMAC because William Giles had become friends with GMAC's representative, Doug Snyder, and because Giles thought that the terms of GMAC's financing arrangement were more favorable.

When Yerington Ford and GMAC entered into their floorplan financing and wholesale security agreements in 1998, all Appellants entered into a "continuing cross-guarantee" with GMAC for both dealerships. Under this guarantee, the Gileses personally guaranteed each dealership's obligations to GMAC, and each dealership guaranteed the other's obligations to GMAC. The guarantors agreed to be responsible for all money owed to GMAC under the floorplan financing agreements. The guarantors further agreed to indemnify

GMAC for losses incurred in litigation arising out of the financing agreements, unless the losses resulted from GMAC's gross negligence or willful misconduct.

In October 2001, GMAC performed its routine monthly audit of the Gileses' dealerships. GMAC performed the audit early in the month, at the Gileses' request, in order to accommodate their planned vacation. On October 11, 2001, GMAC informed the Gileses that the audit had revealed that Yerington Ford had sold or leased a number of vehicles without repaying GMAC the portion of the loan attributable to those vehicles. In the language used in the industry, these vehicles were "out of trust." Yerington Ford owed GMAC approximately $291,000 on out-of-trust vehicles. The discovery that the vehicles were out of trust precipitated the further discovery that the office manager employed by Yerington Ford had embezzled hundreds of thousands of dollars from the dealership.

It is undisputed that, within approximately two weeks of the audit, Yerington Ford paid GMAC the full amount owed on the vehicles out of trust. In the meantime, however, the Gileses had signed documents (collectively, "the October documents") that included assignments to GMAC of all of Yerington Ford's and Giles Chevrolet's proceeds from the sale or lease of vehicles by the two dealerships; a deed of trust placing a $4.3 million lien on property owned by the Gileses (the "Fernly property"); and a forbearance agreement. The forbearance agreement provided that in exchange for 10 days' forbearance on Yerington Ford's debt, a GMAC representative was authorized to be present on the premises of Yerington Ford during all hours of operation; the representative was authorized to take possession of vehicles' titles and keys; and GMAC had the right to be reimbursed for its expenses in monitoring the dealership.

The Gileses presented evidence in the Yerington Ford case in the form of affidavits and deposition testimony that GMAC

employee Jeffrey Sanders threatened to padlock the door of Yerington Ford and to close down the business unless they signed the October documents. According to the Gileses' evidence, Sanders misrepresented the terms of the lien on the Fernly property by telling them that the lien was only for the amount due on the vehicles out of trust rather than for $4.3 million. According to their evidence, Sanders further represented that the lien would be released upon repayment of the debt on the vehicles out of trust.

Upon discovering the out-of-trust vehicles at Yerington Ford, GMAC placed a "hold" on both dealerships' "open account funds." Open account funds include amounts routinely paid to a dealership by car manufacturers, such as factory credits, reimbursement for warranty repairs, reimbursement for preparing vehicles for sale, and advances on retail customers' payment for vehicle purchases. According to the Gileses' evidence, Sanders promised that GMAC would release the holds on the dealerships' open account funds as soon as Yerington Ford paid the amount owing on the vehicles out of trust. However, according to the Gileses, GMAC did not do so. In the Yerington Ford case, according to the Gileses' evidence, GMAC received the dealership's open account funds from the Ford Motor Company until Yerington Ford went out of business in May 2003. In the Giles Chevrolet case, according to the Gileses' complaint, GMAC continued its hold on the dealership's open account funds from the General Motors Corporation until the complaint was filed in October 2004.

According to the Gileses' evidence in the Yerington Ford case, GMAC did not obtain assignments from Appellants authorizing GMAC to place holds on the dealerships' open account funds until several months after they placed such holds. According to the Gileses, GMAC tricked them into signing back-dated assignments of both dealerships' open account funds to make it appear that such assignments had been made about six months before the audit of Yerington

Ford. William Giles testified in his deposition that at a meeting on March 12, 2002, GMAC representative Doug Snyder told the Gileses that the documents were a standard part of the wholesale floorplan agreement, that they were "just for our files," and that other dealerships had signed such an assignment the previous year. According to the Gileses' evidence, Linda Giles signed and back-dated the assignments on March 12 at Snyder's request without reading them or knowing their import. Her signature on Yerington Ford's assignment is dated April 25, 2001; her signature on Giles Chevrolet's assignment is dated May 15, 2001. Appellants also offered evidence to explain the holds' operation before the alleged back-dating of the assignments. According to the deposition testimony of a Ford Motor Company employee who processes assignments of open account funds, it is customary for Ford employees to read and rely on a cover letter describing a purported assignment without actually looking to see whether there is a properly executed assignment in the underlying documents.

Appellants filed suit in the Yerington Ford case on March 19, 2003, claiming that these and other actions by GMAC constituted fraudulent and negligent misrepresentation, conversion, breach of fiduciary and confidential relationship duty, constructive fraud, undue influence, intentional infliction of emotional distress, and breach of contract. They alleged that GMAC's tortious actions and breach of contract harmed Yerington Ford's cash flow and ability to do business, causing financial losses and the eventual closure of Yerington Ford, as well as causing emotional distress to the Gileses.

Due to the cross-guarantee, the Gileses potentially would have had to indemnify GMAC for its losses in the Yerington Ford case if Yerington Ford had prevailed on its contract claims. After GMAC filed a cross-claim seeking such indemnification in the Yerington Ford case, the district court found that counsel representing both the Gileses and Yerington Ford had a conflict of interest with regard to the contract claims. It

concluded that Appellants were required either to drop their contract claims or to obtain separate counsel. Appellants stipulated to a dismissal of their breach of contract claims on June 15, 2004. On December 16, 2004, the district court granted summary judgment to GMAC on the merits of the remaining tort claims.

Meanwhile, on October 8, 2004, Appellants filed suit in the Giles Chevrolet case. The complaint in the Giles Chevrolet case contains tort and contract claims almost identical to those in the Yerington Ford case, based on the same factual allegations. The complaint differs only in that it alleges tortious harm done to Giles Chevrolet and breach of GMAC's contract with Giles Chevrolet. Discovery in the Giles Chevrolet case was stayed pending resolution of the Yerington Ford case. After granting summary judgment to GMAC in the Yerington Ford case, the district court granted summary judgment to GMAC in the Giles Chevrolet case on the ground that all of the claims were barred by claim preclusion.

## II.   Standard of Review

We review a district court's grant of summary judgment de novo. *See Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there is any genuine issue of material fact and whether the district court correctly applied the substantive law. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

A grant of summary judgment is appropriate only where the moving party has demonstrated that there is no genuine issue of material fact. *Lindsey v. Tacoma-Pierce County Health Dep't*, 195 F.3d 1065, 1068 (9th Cir. 1999). Once the moving party demonstrates the absence of a genuine issue of material fact, the nonmoving party must come forward with evidence creating a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Although a

mere scintilla of evidence is insufficient, "the issue of material fact . . . is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

We review a district court's application of state substantive law in diversity actions de novo. *Prieto v. Paul Revere Life Ins. Co.*, 354 F.3d 1005, 1010 (9th Cir. 2004). "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986) (as amended). "In answering that question, this court looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions." *Id.*

### III.   Yerington Ford Case

In the Yerington Ford case, the district court granted summary judgment to GMAC on two grounds. First, the court held that Nevada's economic loss doctrine prevented Appellants from recovering on their tort claims. Second (and in the alternative with respect to Appellants' claims for breach of fiduciary duty, constructive fraud, and undue influence), the court held that GMAC owed no fiduciary duty to the Gileses or to Yerington Ford based on a confidential or special relationship. We address these grounds in turn.

## A. Economic Loss Doctrine

Appellants appeal the dismissal of their tort claims for fraud, conversion, constructive fraud, undue influence, and breach of fiduciary duty. They contend that the district court erred in holding that these claims are barred by Nevada's economic loss doctrine. For the reasons that follow, we agree with Appellants that their tort claims for fraud and conversion are not barred. Because we agree with GMAC that it owed no fiduciary duty to Appellants, we do not decide whether Appellants' claim for breach of fiduciary duty is barred by the economic loss doctrine. For the same reason, we also do not decide whether the economic loss doctrine bars Appellants' claims for constructive fraud and undue influence, because under Nevada law those claims require a breach of an underlying fiduciary duty.

[1] Broadly speaking, the economic loss doctrine is designed to maintain a distinction between damage remedies for breach of contract and for tort. The term "economic loss" refers to damages that are solely monetary, as opposed to damages involving physical harm to person or property. The economic loss doctrine provides that certain economic losses are properly remediable only in contract. The doctrine has roots in common law limitations on recovery of damages in negligence actions in the absence of physical harm to person or property. *See generally Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, 54 (1st Cir. 1985) (Breyer, J.) (reaffirming in an admiralty case the "rule limiting recovery for negligently caused pure financial harm" in the absence of physical injury to person or property, even where such harm was foreseeable); *Onita Pac. Corp. v. Trustees*, 843 P.2d 890, 894-900 (Or. 1992) (discussing and following same common law rule under Oregon law); *Ultramares Corp. v. Touche*, 174 N.E. 441, 444 (N.Y. 1931) (Cardozo, C.J.) (holding that defendant accountants "owed to their employer a duty imposed by law to make their certificate without fraud, and a duty growing out of contract to make it with the care and caution proper to their

calling" but not a tort duty to make it without negligence); *id.* ("If liability for negligence exists, a thoughtless slip or blunder . . . may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes [accountants] to these consequences."); *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927).

However, the "economic loss doctrine" as a separately named and articulated doctrine dates only from the last half century. It first came to prominence in product liability cases. In such cases, the doctrine is intended to maintain traditional limits on manufacturers' liability provided by the law of warranty, except in cases of physical injury to persons or property. *See generally E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866-75 (1986); *id.* at 874 (noting that "[a] warranty action . . . has a built-in limitation on liability . . . . from the agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach"). Some jurisdictions have yet to apply the economic loss doctrine outside the product liability context. *See, e.g., id.* at 871 n.6 (reserving the question whether the doctrine applies in maritime cases outside negligence and strict liability claims for product defects); Minn. Stat. § 604.101 (codifying Minnesota's doctrine, which applies only in product liability cases); *see also Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 885 (1997) (Scalia, J., dissenting) (describing "the so-called 'economic loss' rule" narrowly as the rule that "denies the purchaser of a defective product a tort action against the seller or manufacturer for purely economic losses sustained as a result of the product's failure").

The seminal product liability case is *Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965), in which the plaintiff bought a truck that "bounced violently" when used for heavy duty

hauling. *Id.* at 147. After numerous unsuccessful attempts to cure the problem, the plaintiff sued the truck's manufacturer in both contract and tort. Chief Justice Traynor wrote that the plaintiff could recover expectation and foreseeable consequential damages, including lost profits, from the manufacturer based on contract, but could not recover proximately caused economic damages, including lost profits, in tort. In tort, the plaintiff was limited to damages for physical injury to persons or property.

Chief Justice Traynor explained:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands.

*Id.* at 151.

In *East River*, the Supreme Court, sitting in admiralty, adopted Chief Justice Traynor's rationale for applying the economic loss doctrine to product liability cases. The Court held that if the "public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty" were "allowed to progress too far, contract law would drown in a sea of tort." 476 U.S. at 866. Accordingly, although tort liability for product defects in admiralty

cases extended to physical injury to persons and property, it did not extend to "purely monetary harm" caused as a consequence of a defective product's failure, where the only physical damage was to the product itself. *Id*. at 868, 871. The doctrine is necessary, the Court held, "to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages." *Id*. at 871.

The economic loss doctrine in product liability cases can be easily stated. If a plaintiff is in a contractual relationship with the manufacturer of a product, the plaintiff can sue in contract for the normal panoply of contract damages, including foreseeable lost profits and other economic losses. Whether or not the plaintiff is in a contractual relationship with the manufacturer, the plaintiff can sue the manufacturer in tort only for damages resulting from physical injury to persons or to property other than the product itself.

However, the economic loss doctrine has not been confined to product liability cases. When applied in cases outside the product liability context, the doctrine has produced difficulty and confusion. In such cases, as lamented by the Florida Supreme Court, "the [economic loss] rule has been stated with ease but applied with great difficulty." *Indem. Ins. Co. v. Am. Aviation, Inc*., 891 So. 2d 532, 544 (Fla. 2004) (Cantero, J., concurring) (internal quotation marks and citations omitted).

One reason for the difficulty is that many courts have stated in overly broad terms that purely economic losses cannot be recovered in tort. *See, e.g.*, *Apollo Group, Inc. v. Avnet, Inc.*, 58 F.3d 477, 479 (9th Cir. 1995) ("Generally, under the 'economic loss' rule, a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort."); *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005) ("The economic-loss rule generally prevents recovery in tort of damages for purely economic loss."); *In re Chi. Flood Litig.*, 680 N.E.2d 265, 274 (Ill. 1997) ("At common law, solely eco-

nomic losses are generally not recoverable in tort actions."); *Duffin v. Idaho Crop Improvement Ass'n*, 895 P.2d 1195, 1199-1201 (Idaho 1995) (reversing where lower court failed to recognize limits on the general notion that "purely economic loss cannot be recovered in tort"); *City of Oakbrook Terrace v. Hinsdale Sanitary Dist.*, 527 N.E.2d 70, 74 (Ill. App. Ct. 1988) ("Our supreme court has held that damages for solely economic losses cannot be recovered in tort.").

Such broad statements are not accurate. Tort law has traditionally protected individuals from a host of wrongs that cause only monetary damage. As the Utah Supreme Court has noted, "torts such as fraud and conversion *exist* to remedy purely economic losses." *Grynberg v. Questar Pipeline Co.*, 70 P.3d 1, 11, 13 (Utah 2003) (emphasis added). Many courts have explicitly refused to extend the economic loss doctrine beyond the product liability context or beyond claims for negligence and strict liability. *See, e.g.*, *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226 (10th Cir. 2000) (refusing to apply doctrine because, under Colorado law, "the economic loss rule applies only to tort claims based on negligence, and only to *some* negligence claims"); *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 278-79 (S.D.N.Y. 2004) (allowing fraud claim to go forward because New York law permits recovery of economic loss on claims of fraud and fraud in the inducement even "in tandem" with contract claims); *Indem. Ins. Co.*, 891 So. 2d at 543 n.3 (noting that "[i]ntentional tort claims such as fraud, conversion, intentional interference, civil theft, abuse of process, and other torts requiring proof of intent generally remain viable" despite economic loss doctrine); *In re Chi. Flood Litig.*, 680 N.E.2d at 274-75 (describing Illinois' doctrine, which applies only to "tort theories of strict liability, negligence, and innocent misrepresentation" and not to "intentional, false representation, *i.e.*, fraud" or "negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions"); *Huron Tool & Eng'g Co. v. Precision Consulting*

*Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995) (noting that torts outside the doctrine's scope include defamation, misrepresentation, intentional misrepresentation, tortious interference with prospective economic advantage, intentional interference with contractual relations, and certain fraud in the inducement claims); *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 285-87 (Pa. 2005) (declining to apply economic loss doctrine and permitting recovery for negligent misrepresentation where defendant supplies false information for the guidance of others in business transactions, as described in Restatement (Second) of Torts § 552); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 & n.2 (S.C. 1995) (noting that "[p]urely 'economic loss' may be recoverable under a variety [of] tort theories" where "[a] breach of a duty aris-[es] independently of any contract duties" and listing as examples libel, defamation, various forms of professional malpractice, and the existence of a "special relationship"); *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 435 (Tenn. 1991) (declining to extend the economic loss doctrine beyond product liability and allowing recovery for negligent misrepresentation under Restatement (Second) of Torts § 552); *Am. Towers Owners Ass'n, Inc. v. CCI Mech., Inc.*, 930 P.2d 1182, 1190 n.11 (Utah 1996) (noting that doctrine does not bar recovery of "purely economic losses in cases involving *intentional* torts, e.g., fraud, business disparagement, intentional interference with contract, etc."); *see also* Minn. Stat. § 604.101 (codifying Minnesota's doctrine, which limits compensatory damages only in product liability cases and permits claims of intentional or reckless misrepresentation regarding the goods).

Most courts that have applied the economic loss doctrine beyond product liability cases have done so to bar recovery of economic loss in negligence and strict liability. *See, e.g.*, *Corporex Dev.*, 835 N.E.2d at 704 ("The well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner

which is legally cognizable or compensable." (quoting *Neb. Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124, 126 (Iowa 1984)) (internal quotation marks omitted)); *Gerald M. Moore & Son, Inc. v. Drewry*, 467 S.E.2d 811, 813 (Va. 1996) (holding that the doctrine bars recovery of economic loss in actions for negligence in performance of contract); *O'Connell v. Killington, Ltd.*, 665 A.2d 39, 42-43 (Vt. 1995) (barring recovery of economic loss in negligence in ski accident case because "[n]egligence law does not generally recognize a duty to exercise reasonable care to avoid intangible economic loss to another unless one's conduct has inflicted some accompanying physical harm"); *FMR Corp. v. Boston Edison Co.*, 613 N.E.2d 902, 903 (Mass. 1993) (barring recovery of economic loss in negligence where power outage caused loss).

However, some courts have applied the economic loss doctrine to bar recovery on tort claims beyond negligence and strict liability. Where such tort claims have been barred, they have usually amounted to nothing more than a failure to perform a promise contained in a contract. In such cases, the plaintiff has been held to be entitled only to ordinary contract damages. For example, if the tort alleged is intentional or fraudulent misrepresentation by a seller to a buyer, but the misrepresentation only goes to the quality or quantity of the goods promised in the contract, some courts limit the buyer to contract remedies:

> Where there are well-developed contractual remedies, such as the remedies that the Uniform Commercial Code (in force in all U.S. states) provides for breach of warranty of the quality, fitness, or specifications of goods, there is no need to provide tort remedies for misrepresentation. The tort remedies would duplicate the contract remedies, adding unnecessary complexity to the law. Worse, the provision of these duplicative tort remedies would undermine contract law. That law has been shaped

by a tension between a policy of making the jury the normal body for resolving factual disputes and the desire of parties to contracts to be able to rely on the written word and not be exposed to the unpredictable reactions of lay factfinders to witnesses who testify that the contract means something different from what it says. Many doctrines of contract law, such as the parol evidence and "four corners" rules, are designed to limit the scope of jury trial of contract disputes (a further example is the statute of frauds). Tort law does not have these screens against the vagaries of the jury.

*All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 865-66 (7th Cir. 1999) (Posner, J.); *see also Apollo Group*, 58 F.3d at 480-81 (barring common law tortious breach of warranty and negligent misrepresentation claims under Arizona law because plaintiff sought "to recover purely 'benefit of the bargain' " economic losses based on "foreseeable risks [that] could have been — and indeed were — allocated by the parties in their contractual agreement"); *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 990 (7th Cir. 2005) (barring fraud claim under Wisconsin law because it "pertain[ed] to the character and quality of the product that [was] the subject matter of the contract"); *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 679-81 (3d Cir. 2002) (barring fraud claim under Pennsylvania law because "appellants are unable to explain why contract remedies are inadequate to provide redress when the alleged misrepresentation relates to the quality or characteristics of the goods sold"); *Hoseline, Inc. v. U.S.A. Diversified Prods., Inc.*, 40 F.3d 1198, 1200 (11th Cir. 1994) (barring fraud and civil theft claims under Florida law where defendant allegedly "misrepresented the amount of coil in its boxes" because "[i]n essence, both . . . claims arose from USA's breach of its contractual obligation to ship certain quantities"); *First Care Med. Clinic, Inc. v. Polymedco, Inc.*, No. 3:05-CV-82, 2006 WL 3497845, at *3-5 (W.D.N.C. Dec. 4, 2006) (barring recovery of economic loss for intentional

misrepresentation about product in product liability action); *Huron Tool*, 532 N.W.2d at 546 (barring fraud claim in software defect case because the alleged misrepresentations were "indistinguishable from the terms of the contract and warranty" and therefore plaintiff "fail[ed] to allege any wrongdoing by defendants independent of defendants' breach of contract and warranty"); *id.* at 545 (holding generally that fraud claims are barred only "where the . . . misrepresentation by the dishonest party concerns the quality or character of the goods sold" but not where fraud in the inducement takes other forms "extraneous to the contract"); *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 219-21 (Wis. 2005) (following *Huron Tool* in recognizing fraud in the inducement exception except where the fraud concerns the quality or characteristics of goods); *see also Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 881 P.2d 986, 992 (Wash. 1994) (limiting recovery for construction delays to contract remedies to increase "predictability in allocating risk"). The result of the application of the economic loss doctrine in such cases is not that buyers are unable to recover for economic losses. Rather, the result is that they must seek recovery for their economic losses in contract rather than in tort.

The leading Nevada case on the economic loss doctrine is *Calloway v. City of Reno*, 993 P.2d 1259 (Nev. 2000). *Calloway* is conceptually similar to *Seely*, the paradigmatic product liability case decided by the California Supreme Court thirty-five years earlier. Owners of recently built townhouses sued subcontractors for allegedly negligent framing work performed during construction. *Id.* at 1261-62. The Nevada Supreme Court analogized housing construction cases to product liability cases and held that "purely economic losses" arising from improper performance of a construction contract (or subcontract) may be recovered only in a suit for breach of contract. *Id.* at 1269. The damages that may be recovered in a tort suit for defective construction are limited to physical injury to persons or to property other than the structure itself. *Id.* at 1267.

The Nevada Supreme Court made clear in *Calloway* that, as used in relation to the economic loss doctrine, "purely economic loss" is a term of art. *Id.* at 1263. It does not refer to all economic loss, but only to economic loss that would be recoverable as damages in a normal contract suit. *Id.* According to *Calloway*, "[p]urely economic loss is generally defined as 'the loss of the benefit of the user's bargain . . . including . . . pecuniary damage for inadequate value, the cost of repair and replacement of the defective product, or consequent loss of profits, without any claim of personal injury or damage to other property.' " *Id.* (quoting *American Law of Products Liability* § 60:36, at 66) (elipses in original); *accord Nat'l Union Fire Ins. Co. v. Pratt & Whitney Canada, Inc.*, 815 P.2d 601, 603 n.2 (Nev. 1991). The Court described the purpose of the economic loss doctrine in language similar to that used by Chief Justice Traynor in *Seely*:

> Contract law is designed to enforce the expectancy interests created by agreement between the parties and seeks to enforce standards of quality . . . . In contrast, tort law is designed to secure the protection of all citizens from the danger of physical harm to their persons or to their property and seeks to enforce standards of conduct. These standards are imposed by society, without regard to any agreement. Tort law has not traditionally protected strictly economic interests related to product quality — in other words, courts have generally refused to create a duty in tort to prevent such economic losses.

*Calloway*, 993 P.2d at 1265-66. The Court refused to delineate the entire universe of claims that would, or would not, be subject to the economic loss doctrine. Rather, the Court held, "the more reasoned method" is to examine in each case "the relevant policies in order to ascertain the proper boundary between the distinct civil law duties that exist separately in contract and tort." *Id.* at 1266 n.3.

*Calloway* built on an earlier case, *Bernard v. Rockhill Development Co.* 734 P.2d 1238 (Nev. 1987), in which the Nevada Supreme Court declined to apply the economic loss doctrine to an intentional tort suit. *See Calloway*, 993 P.2d at 1263-65. The parties in *Bernard* had entered into an agreement under which Rockhill Development would sell a particular lot to the Bernards and would then build a residence on the lot for them. 734 P.2d at 1239. The Bernards recorded the contract of sale. *Id*. Later, while attempting to get construction money, Rockhill asked the Bernards to " 'unrecord' " the contract of sale, thereby releasing any lien or encumbrance on the title to the lot. *Id*. at 1239-40. The Bernards unrecorded the contract, but Rockhill never built the residence. *Id*. at 1239. The Bernards sued both for breach of contract and in tort. In connection with their tort claim, they sought punitive damages, alleging that Rockhill had falsely and maliciously represented to them that it would perform the contractual obligation to build the residence after the Bernards unrecorded the contract. *Id*. at 1239-40. The district court dismissed the tort claim on the pleadings as an "attempt[ ] to create an additional claim for relief sounding in tort by 'cloaking' their breach of contract claim with language which suggested the tort of misrepresentation." *Id*. at 1240.

The Nevada Supreme Court reversed, reinstating the misrepresentation claim. It wrote:

> There is no question that a contractual relationship existed between Rockhill and the Bernards as a result of their agreement to build and purchase a residence . . . . However, when Rockhill asked the Bernards to "unrecord" the contract of sale and thereby release any lien or encumbrance on the title to Lot 8, the Bernards surrendered a valuable legal right: notice to the public of their contractual rights to Lot 8. In contrast, Rockhill gave up nothing because it was already under a legal duty by virtue of the 1981 contract. Rockhill had a separate duty, independent

of that imposed by the 1981 contract, not to make false promises or fraudulently misrepresent its intention to perform.

*Id.*

Consistent with *Calloway*, the Nevada Supreme Court has barred recovery for economic loss in product liability cases as well as in negligence cases unrelated to product liability. *See, e.g.*, *Arco Prods. Co. v. May*, 948 P.2d 263, 266 (Nev. 1997) (barring recovery under strict liability for lost profits due to defective cash registers); *Nat'l Union Fire Ins. Co.*, 815 P.2d at 603-04 (following *East River* in holding that a defective engine's damage to the airplane constituted a product damaging itself and barring recovery of economic loss in negligence); *Cent. Bit Supply v. Waldrop Drilling & Pump, Inc.*, 717 P.2d 35, 36-37 (Nev. 1986) (barring recovery in negligence and strict liability for purely economic loss due to faulty drill); *Local Joint Executive Bd. of Las Vegas, Culinary Workers Union v. Stern*, 651 P.2d 637, 638 (Nev. 1982) (barring recovery in negligence for lost wages and benefits after a hotel fire); *see also Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 110 P.3d 30, 51 (Nev. 2005) (en banc) (barring negligence claim based on alleged "reasonable duty to inform" without undertaking analysis under *Calloway*).

**[2]** Based on our reading of the Nevada cases, Nevada's economic loss doctrine is generally consistent with the principles discernable in the case law of other jurisdictions. Broadly speaking, Nevada applies the economic loss doctrine to bar recovery in tort for purely monetary harm in product liability and in negligence cases unrelated to product liability. Nevada law may also bar recovery for other tort claims where the plaintiff's only complaint is that the defendant failed to perform what was promised in the contract. But it does not bar recovery in tort where the defendant had a duty imposed by law rather than by contract and where the defendant's inten-

tional breach of that duty caused purely monetary harm to the plaintiff.

**[3]** It appears to be a question of first impression in Nevada law whether the economic loss doctrine applies to fraud and conversion claims. Applying the principles set forth by the Nevada Supreme Court in *Calloway*, we hold that Appellants' fraud and conversion claims are not barred.

### 1.    Fraud

**[4]** Viewing the evidence in the light most favorable to Appellants, GMAC committed fraud. According to the Gileses' evidence, GMAC placed a hold on Yerington Ford's open account funds without legal authority to do so, and then fraudulently tricked the Gileses into signing and back-dating an assignment of those funds in March 2002 by representing to the Gileses that the assignment was merely a standard part of the floorplan agreement that other dealerships had already signed. GMAC argues that Nevada law bars this fraud claim because it is "intertwined with" the contracts between the parties. GMAC argues that the claim "pertains to actions purportedly taken by GMAC after and in response to the 'out of trust' sales" and "concerns modifications to the parties' funding relationship which Appellants maintain were in some manner improper or not otherwise authorized by the terms of the [wholesale security agreement]."

**[5]** Although the events giving rise to Appellants' fraud claim did occur in the context of a contractual relationship between the parties, the claim is not a mere contract claim cloaked in the language of tort. Appellants claim fraud in the inducement rather than fraud in the execution or promissory fraud. Unlike a fraud claim that duplicates a contract claim by alleging misrepresentation about the characteristics or quality of goods that are the subject of the contract, Appellants' fraud claim is what the Wisconsin and Michigan courts would call fraud "extraneous" to the contract. *Huron Tool*, 532 N.W.2d

at 545; *Kaloti Enters.*, 699 N.W.2d at 585. Like the defendant in *Bernard*, GMAC had an independent "duty imposed by law" not to commit fraud, a duty not "arising by virtue of the alleged express agreement between the parties." *Calloway*, 993 P.2d at 1263 (quoting *Bernard*, 734 P.2d at 1240).

**[6]** If Appellants' evidence is believed, GMAC's conduct breached a duty imposed by law, not by contract. Appellants' tort claim based on GMAC's fraudulent misrepresentation in inducing them to sign and back-date the assignment does not duplicate a contract suit based on the rights and duties of the parties under the floorplan financing and wholesale security agreements. Rather, the claim is based on behavior outside the contractual obligations and in violation of the duty imposed under Nevada law not to commit fraud. That is, GMAC's conduct did not represent a mere failure to perform its contractual obligations to Appellants and went beyond what it was authorized to do under its contract in the event of breach by Appellants. We therefore hold that the economic loss doctrine does not bar Appellants' fraud claim.

## 2. Conversion

Again viewing the evidence in the light most favorable to Appellants, GMAC converted Appellants' open account funds by taking these funds without a valid assignment. GMAC makes a virtually identical economic loss doctrine argument against Appellants' conversion claim. GMAC contends that Appellants do not have a claim for conversion because that claim is "intertwined with" the parties' prior contracts.

**[7]** However, none of the parties' prior agreements actually provided for the assignment of the open account funds, and the alleged wrongful taking of the open account funds does not duplicate a contract claim. GMAC had an independent duty imposed under tort law not to take Appellants' property without legal authority to do so. For the reasons given above, the economic loss doctrine does not bar recovery of damages

for breach of that duty. We therefore hold that the economic loss doctrine also does not bar Appellants' conversion claim.

### B.   Fiduciary Duty Based on a Confidential or Special Relationship

The district court granted summary judgment to GMAC on Appellants' claims for breach of fiduciary duty arising from a confidential or special relationship. Appellants' claims for constructive fraud and undue influence and the Gileses' claim for intentional infliction of emotional distress also depend on Appellants' contentions that GMAC had fiduciary duties to Yerington Ford and the Gileses, and that GMAC breached those duties. Based on the arguments presented to the district court below, we affirm its grant of summary judgment to GMAC with respect to fiduciary duty.

**[8]** Under Nevada law, "[a] fiduciary relationship is deemed to exist when one party is bound to act for the benefit of the other party. Such a relationship imposes a duty of utmost good faith." *Hoopes v. Hammargren*, 725 P.2d 238, 242 (Nev. 1986) (holding that doctors have fiduciary relationship to patients). "The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, since the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." *Id.* (internal quotation marks and citation omitted).

**[9]** The Nevada Supreme Court has held that fiduciary duties arise as a matter of law in certain categories of relationships. *See, e.g.*, *Powers v. United Servs. Auto. Ass'n*, 979 P.2d 1286, 1288 (Nev. 1999) (insurers and insured); *Cook v. Cook*, 912 P.2d 264, 266 (Nev. 1996) (attorney and client); *id.* (spouses); *Fick v. Fick*, 851 P.2d 445, 449-50 (Nev. 1993) (fiancés); *Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1224 (Nev. 1987) (corporate officers or directors and corporation). In relationships falling outside these categories, Nevada law

recognizes a duty owed in "confidential relationships," where "one party gains the confidence of the other and purports to act or advise with the other's interests in mind." *Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995) (per curiam) (internal quotation marks and citation omitted). The duty owed is comparable to a fiduciary duty: "When a confidential relationship exists, the person in whom the special trust is placed owes a duty to the other party similar to the duty of a fiduciary, requiring the person to act in good faith and with due regard to the interests of the other party." *Id.* A confidential relationship "may exist although there is no fiduciary relationship; it is particularly likely to exist when there is a family relationship or one of friendship." *Id.* (internal quotation marks and citation omitted). Demonstrating a confidential relationship fulfills the fiduciary duty element of actions for constructive fraud and undue influence. *See id.* at 337; *Peardon v. Peardon*, 201 P.2d 309, 333 (Nev. 1948). In *Perry*, the Nevada Supreme Court found a confidential relationship between two "close friends and neighbors," where an experienced and well-educated business woman sold a business to her friend, who had only an eighth-grade education and who entrusted her friend, the experienced business woman, with managing the business. 900 P.2d at 336-38.

Nevada also recognizes "special relationships" giving rise to a duty to disclose, such that "[n]ondisclosure . . . become[s] the equivalent of fraudulent concealment." *Mackintosh v. Jack Matthews & Co.*, 855 P.2d 549, 553 (Nev. 1993). In order to prove the existence of a special relationship, a party must show that (1) "the conditions would cause a reasonable person to impart special confidence" and (2) the trusted party reasonably should have known of that confidence. *Mackintosh v. Cal. Fed. Sav. & Loan Ass'n*, 935 P.2d 1154, 1160 (Nev. 1997) (per curiam). "[T]he existence of the special relationship is a factual question . . . ." *Id.* In the *Mackintosh* cases, the Nevada Supreme Court recognized a special relationship imposing a duty to disclose where a lender sold a house it knew was vulnerable to severe flooding to a buyer on an "as-

is" basis, on condition that the buyer obtain its mortgage from the lender. *Id*. at 1159-60. The court found that the buyer reasonably believed that the seller would inform the buyer of latent defects in the house because the seller was providing long-term financing on the house and had voluntarily performed other repairs before and after escrow closed. *Id*. at 1160. It further found that "a reasonable lender would have known of the special confidence": "[A] third party lender would likely not have lent money on the home unless and until the flooding problem was corrected and . . . it was a reasonable inference that Cal Fed required the Mackintoshes to seek a loan through it for that reason." *Id*.

Appellants contend that confidential and special relationships arose between GMAC and Yerington Ford and between GMAC and the Gileses during the course of the parties' dealings.[1] Appellants do not challenge the district court's holding that the Nevada Supreme Court would not recognize a fiduciary relationship as a matter of law between a lender and borrower (GMAC and Yerington Ford), or between a lender and

---

[1] Appellants also contend on appeal that GMAC's actions after October 10, 2001, constituted acts of domination or excessive control over Yerington Ford that created a fiduciary duty in GMAC. *Cf. Pension Trust Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 955 (9th Cir. 2002) (recognizing under California law that "a lender . . . owes a fiduciary duty to a borrower when it excessively controls or dominates the borrower"); *In re Monohan Ford Corp. of Flushing*, 340 B.R. 1, 41 (Bankr. E.D.N.Y. 2006) (recognizing same under New York law). This contention was not made in, or considered by, the district court. *Yerington Ford*, 359 F. Supp. 2d at 1085-94. As a general rule, we do not consider issues raised for the first time on appeal, *see Citibank (S.D.) v. Eashai (In re Eashai)*, 87 F.3d 1082, 1085 n.2 (9th Cir. 1996), and we decline to do so here. *Cf. Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004) (noting our discretion to consider an issue for the first time on appeal where necessary to prevent a miscarriage of justice; where the issue arose because of a change in the law; or where the question is purely legal and the factual record is sufficiently developed). We leave it to the district court on remand to determine whether to allow Appellants to present a fiduciary duty argument based on domination and control.

guarantor (GMAC and the Gileses). *See Yerington Ford*, F. Supp. 2d at 1088-90, 1092. Thus, if a fiduciary relationship exists in this case, it exists because of the specific actions and particular situations of the parties.

According to their evidence, the Gileses were encouraged to place confidence in GMAC by a GMAC representative's comment upon the signing of their first financing agreement between Giles Chevrolet and GMAC in 1992. The GMAC representative commented to the Gileses that the financing relationship was "like a marriage, what works for one works for the other, and one takes care of the other." William Giles stated that his view of their relationship was that "we look out for each other's interest, because they make money from doing business with me."

The Gileses contend that they were further encouraged to place trust in GMAC by their personal friendship with Doug Snyder, the GMAC representative with whom the Gileses did business beginning sometime in 1996. William Giles and Snyder had personal conversations over the phone and occasionally had dinner together. In 1998, William Giles chose to finance Yerington Ford through GMAC not only because he viewed it as the more financially favorable option, but also because of his friendship with Snyder. He stated that part of his motivation for switching Yerington Ford to GMAC was that "it would be a real feather in [Snyder's] cap pulling a Ford store over to GMAC."

**[10]** The Gileses offer as evidence of their trust and confidence in GMAC the fact that they signed documents without reading them, relying on GMAC's representations about the contents of those documents. Those documents include the $4.3 million lien on the Fernly property signed in October 2001 and the back-dated assignments signed in May 2002. Responding to a question at his deposition about whether "a prudent businessman might want to read the crucial documents for the operation of his business," William Giles

responded, "Not when you have a relationship with a company for many, many years."

GMAC notes that the Gileses signed three agreements on behalf of the dealerships disavowing the existence of a fiduciary relationship between GMAC and the dealerships. Giles Chevrolet entered into a lease plan with GMAC in 1992 that included among its provisions: "Neither party owes the other any fiduciary obligation." This "GMAC Lease Plan" provided for GMAC's purchases of consumers' leases and the associated leased vehicles from the dealership. Yerington Ford entered into a lease agreement containing the same provision in 1997, as well as a "GMAC Retail Plan" providing for GMAC's purchases of consumers' retail installment contracts from the dealership and also containing the provision. William Giles also did not read these documents before signing them. There are no such provisions in the wholesale security agreements governing the dealerships' floorplan financing from GMAC.

The Gileses describe themselves as "unsophisticated in the matters of wholesale floorplan financing." However, even according to their own evidence, before founding Giles Chevrolet, William Giles worked at another Chevrolet dealership from 1974 to 1991, serving as that dealership's general sales manager from 1985 until 1991. Although he did not attend meetings regarding the dealership's own financing from GMAC and was not involved in that aspect of the business, he attended meetings between that dealership's owner and GMAC concerning retail and lease contracts.

We agree with the district court that, based on this evidence, Appellants have failed to raise a genuine issue of material fact that would support a finding of a confidential or special relationship either between GMAC and Yerington Ford or between GMAC and the Gileses. Even resolving every factual dispute in their favor, no reasonable finder of fact could find, based on the arguments presented to the dis-

trict court, that either relationship existed. *Cf. Anderson*, 477 U.S. at 248.

[11] Appellants have not produced evidence sufficient to support a finding that a confidential or special relationship arose because Appellants placed "a special trust," *Perry*, 900 P.2d at 338, or "special confidence," *Mackintosh*, 935 P.2d at 1160, in GMAC.[2] Appellants do not contend that signing a contract without reading it is, by itself, an act of special trust or confidence sufficient to transform an arms-length relationship into a quasi-fiduciary relationship. The "marriage" comment made by a GMAC representative at the signing of Giles Chevrolet's 1992 agreement is insufficient to raise a genuine issue of material fact given that there is no evidence that Appellants' relationships with GMAC actually were any more "marriage-like" than a standard friendly but arms-length business relationship. As the district court noted, the law of contract would dissolve if an ordinary personal friendship between business associates like the one between Snyder and the Gileses were sufficient to transform an otherwise arms-length business transaction into a transaction based on a confidential or special relationship. *Yerington Ford*, 359 F. Supp. 2d at 1091.

[12] We therefore affirm the district court's holding that Appellants failed to raise a genuine issue of material fact as to whether GMAC owed a fiduciary duty to Yerington Ford or the Gileses.

## IV. Giles Chevrolet Case

In the Giles Chevrolet case, the district court granted summary judgment to GMAC based on claim preclusion. Apply-

---

[2]For the reasons stated in footnote 1, *supra*, we express no opinion on whether GMAC's actions following the discovery that the vehicles were out of trust gave rise to fiduciary or confidential relationship duties in GMAC.

ing Nevada law, the district court held that the claims in the Yerington Ford case and the Giles Chevrolet case were identical; that there was a final judgment in the Yerington Ford case; and that there was either identity or privity of parties in the two cases. Appellants in the Giles Chevrolet case appeal the grant of summary judgment based on claim preclusion with respect to their contract claims. Although Appellants do not appeal the district court's preclusion decision with respect to their tort claims, they note that, if we reverse the district court's decision in the Yerington Ford case on any of the tort claims, the district court's decision on those claims cannot have preclusive effect in the Giles Chevrolet case. They thus ask that if we reverse the decision in the Yerington Ford case with respect to any of the tort claims in that case, we also reverse the decision in the Giles Chevrolet case with respect to the parallel tort claims.

For the reasons that follow, we reverse the district court's grant of summary judgment against Appellants on their contract claims in the Giles Chevrolet case based on claim preclusion. We also reverse the district court's decision on Appellants' tort claims that are based on fraud and conversion.

We agree with the district court that in this diversity case where only substantive state law is at issue we apply the preclusion law that the Nevada courts would apply. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508-09 (2001). On at least one occasion, the Nevada Supreme Court has applied federal law to determine the preclusive effect of a prior federal court judgment. *See Clark v. Columbia/HCA Info. Servs.*, 25 P.3d 215, 224 (Nev. 2001) (en banc). But in that case the federal court decision had been based on federal rather than state law. When a prior federal court decision has been based on state law, Nevada courts have applied Nevada preclusion law. *See LaForge v. State*, 997 P.2d 130, 133-34 (Nev. 2000); *Alitalia-Linee Aeree Italiane-S.p.A. v. Second Jud. Dist. Ct.*, 556 P.2d 544, 545 (Nev. 1976) (per curiam).

We therefore apply Nevada preclusion law to determine the effect, if any, to be given the judgment of the federal district court in the Yerington Ford case.

**[13]** Under Nevada law, "[g]enerally, the doctrine of res judicata precludes parties or those in privity with them from relitigating a cause of action or an issue which has been finally determined by a court of competent jurisdiction." *Univ. of Nev. v. Tarkanian*, 879 P.2d 1180, 1191 (Nev. 1994) (per curiam). "The modern view is that claim preclusion embraces all grounds of recovery that were asserted in a suit, as well as those that could have been asserted . . . ." *Id.* at 1192. In order for claim preclusion to apply under Nevada law, the two claims must be based on the same "cause of action." *Executive Mgmt., Ltd. v. Ticor Title Ins. Co.*, 963 P.2d 465, 473 (Nev. 1998) (per curiam) (internal quotation marks and citation omitted); *accord Round Hill Gen. Improvement Dist. v. B-Neva, Inc.*, 606 P.2d 176, 178 (Nev. 1980); *In re Estate of Firsching*, 578 P.2d 321, 322 (Nev. 1978) (per curiam); *see also Holcombe v. Hosmer*, 477 F.3d 1094, 1097-98 (9th Cir. 2007). We address only the question whether the contract claims dismissed in the Yerington Ford case were the same "cause of action" as the contract claims in the Giles Chevrolet case. We do not reach the question whether there was a final judgment on the contract claims in the Yerington Ford case that was entitled to preclusive effect; nor do we reach the question whether there was privity among all the parties in the two cases.

The Nevada Supreme Court has explained the "same cause of action" test:

> "The true test of identity of 'causes of action,' as that term is used in connection with the plea of former adjudication, is the identity of the facts essential to their maintenance . . . . The authorities agree that when the same evidence supports both the present and the former cause of action, the two causes of

action are identical . . . ." Thus, if appellant's claim is based upon evidence of new and independent delinquencies, there can be no such identity.

*Round Hill*, 606 P.2d at 178 (quoting *Silverman v. Silverman*, 283 P. 593, 598 (Nev. 1930) (Coleman, J., concurring)). Identity of claims under Nevada law has also been described as "one right" and "one wrong": "The test of a cause of action for res judicata purposes is the identity of facts essential to maintain the two suits; if the facts show only one right of the plaintiff and one wrong by the defendant involving that right there is only one cause of action." *Firsching*, 578 P.2d at 322 (quoting *Bissell v. Coll. Dev. Co.*, 517 P.2d 185, 187 (Nev. 1973)).

**[14]** Giles Chevrolet's contract claims are not barred by claim preclusion under Nevada's "cause of action" test. Giles Chevrolet's and Yerington Ford's contracts do not involve the same "rights." Giles Chevrolet's contract claims depend on Giles Chevrolet's rights under its 1992 contract with GMAC, not Yerington Ford's rights under its own separate, and later, contract with GMAC. These contracts are nearly identical, but they establish different rights — rights belonging to Giles Chevrolet in one case, and rights belonging to Yerington Ford in the other. Similarly, the claimed violations of the contracts do not involve the same "wrongs." The alleged breaches of one contract harmed Giles Chevrolet in violation of Giles Chevrolet's contract; the alleged breaches of the other contract harmed Yerington Ford in violation of its contract. *Cf. Zalk-Josephs Co. v. Wells Cargo, Inc.*, 400 P.2d 621, 622-23 (Nev. 1965) (applying claim preclusion where claims arose from "the same guaranty provision" of "the same and identical state contract" between Wells Cargo and the state).

**[15]** Because the "cause of action" prong of Nevada preclusion law is not satisfied, the summary judgment on the contract claims in the Yerington Ford case cannot have preclusive effect on the contract claims in the Giles Chevrolet case. We

therefore reverse the district court's grant of summary judgment on the contract claims in the Giles Chevrolet case. We also reverse the grant of summary judgment to GMAC on Appellants' fraud and conversion claims. Because we have reversed the district court's judgment on the fraud and conversion claims in the Yerington Ford case, that judgment cannot serve as the basis for preclusion-based dismissal of the parallel claims in the Giles Chevrolet case. *See Fitzharris v. Phillips*, 333 P.2d 721, 724 (Nev. 1958); *Cal. Dep't of Soc. Servs. v. Thompson*, 321 F.3d 835, 847 (9th Cir. 2003).

## Conclusion

In the Yerington Ford case, we reverse the district court's holding that the economic loss doctrine barred Appellants' tort claims for fraud and conversion. We affirm the court's holding that Appellants failed to raise a genuine issue of material fact with regard to a fiduciary duty owed by GMAC.

In the Giles Chevrolet case, we reverse the district court's grant of summary judgment to GMAC on the contract claims and on the tort claims for fraud and conversion.

We remand both cases for further proceedings not inconsistent with this opinion. In the Yerington Ford case, each side shall bear its own costs. In the Giles Chevrolet case, we award costs against GMAC.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**