**QC CONSTRUCTION PRODUCTS, LLC, a Delaware limited liability company, Plaintiff,**

v.

**COHILL'S BUILDING SPECIALTIES, INC., and Michael Cohill, Defendants.**

**And Related Counterclaims**

**No. 03 1997 PHX ROS.**

United States District Court, D. Arizona.

March 21, 2006.

---

Russell K. Ryan, Motschiedler Michaelides & Wishon LLP, Fresno, CA, for Plaintiff.

Kent A. Lang, William George Klain, Lang & Baker PLC, Scottsdale, AZ, for Defendants.

## OPINION AND ORDER

SILVER, District Judge.

This case stems from a dispute between Plaintiff QC Construction Products ("QC") and defendant Cohill's Building Specialties, Inc. ("Cohill's") regarding each parties' contractual obligations. Both parties filed a Motion for Summary Judgment. QC's Motion for Summary Judgment will be denied and Cohill's Motion will be granted in part.

## BACKGROUND

The following facts are taken from the parties' statements of facts and are not disputed. Michael Cohill and Karen Cohill purchased Cohill's from a third party in 1983. Since that time, Cohill's sold decorative concrete materials and related products in Arizona. One of the products was an iron oxide pigment known as "Bayferrox." This product was originally purchased from Bayer Corporation and entities through which Bayer sold the product.

From 1991 to 1999, QC was doing business as a wholly-owned unincorporated division of non-party Bomanite Corporation. QC was organized as a limited liability company under the laws of Delaware on August 24, 1999. QC and Bomanite were also involved in the decorative concrete material market, producing a synthetic iron oxide product called QC Colorcrete. In 1998, Bomanite and Bayer entered into a strategic alliance that allowed Bomanite to distribute Bayferrox. Also in 1998, representatives from Bomanite and Bayer negotiated with representatives of Cohill's regarding a business venture. As a result of those negotiations, Cohill's entered into a "Letter of Agreement." That letter was signed by L. Russell Ingersoll on behalf of QC and Michael Cohill on behalf of Cohill's. At the time this agreement was signed, QC was still a division of Bomanite.

The agreement lies at the core of this dispute, and the first paragraph reads,

confirmation of [the] agreement for QC Construction Products to supply Bayferrox synthetic iron oxide pigment, BAYFERROX by QC Construction Products and the QC Construction Products concrete coloring systems line of products exclusively to Cohills Building Specialties, Inc. ... beginning November 1, 1998 and continuing for a period of ten years.

The second paragraph recites that the territory for the agreement is the state of Arizona. The third paragraph, with a heading of "Master Distributorship," states QC's obligations.

QC Construction Products shall provide exclusive support and material sales to Cohills towards developing the market for Bayferrox synthetic iron oxides, BAYFERROX by QC Construction Products and the QC Construction Products concrete coloring systems line of products throughout the territory of the state of Arizona.

The fourth paragraph recites the parties' understanding regarding payment terms. The fifth paragraph was addressed to "Volume." According to that paragraph,

Cohills shall purchase from QC Construction Products 100% of their requirements for synthetic iron oxides and BAYFERROX by QC Construction Products. Within twelve (12) months of the execution of this agreement, every effort will be made by Cohills to purchase from QC Construction Products 100% of their requirements for the full line of QC Construction Products concrete coloring systems ... unless anoth-

er competing product is specified and connot (sic) be switched over.

The penultimate paragraph was titled a "Best Efforts Provision" and stated that "Cohills shall use its best efforts as the master distributor to develop the marketplace throughout the territory of the state of Arizona" for all of QC's products. The final paragraph asked for a signature by Michael Cohill accepting the terms. The agreement was signed by L. Russell Ingersoll, President of Bomanite, and Michael Cohill, part-owner of Cohill's.

The parties' do not agree about the events that transpired after the agreement was signed. QC contends that Cohill's eventually stopped ordering its products and gave misleading reasons why it stopped. Cohill's contends that immediately after the parties entered into their agreement QC sold its products to other businesses entities in Arizona. Cohill's also believes that QC was unable to deliver products as required by the contract.

QC filed suit in October 2003. That suit contained five claims against Cohill's: 1) breach of contract; 2) interference with business relationships and prospective economic advantage; 3) fraud and deceit; 4) unfair competition; and 5) accounting. (Doc. 1). In its answer, Cohill's asserted a counterclaim for breach of contract. QC has moved for summary judgment on its breach of contract claim. Cohill's has moved for summary judgment on all of QC's claims as well as its own breach of contract claim.

## ANALYSIS

### I. Jurisdiction

QC is a limited liability company organized under the laws of Delaware with its primary place of business in California. Cohill's is a corporation organized under the laws of Arizona with its principal place of business in Arizona. The amount in controversy is over one million dollars. (Doc. 1) Therefore, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

### II. Applicable Law

A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Arizona courts apply the Restatement to determine the applicable law in a contract action. *Swanson v. The Image Bank, Inc.,* 206 Ariz. 264, 77 P.3d 439, 441 (2003). The parties' contract does not contain an explicit choice of law provision, so the contractual rights and duties of the parties are governed by the law of the state having "the most significant relationship to the parties and the transaction." *Cardon v. Cotton Lane Holdings, Inc.,* 173 Ariz. 203, 841 P.2d 198, 202 (1992) (citing *Restatement (Second) Conflict of Laws* § 188 (1971)). Cohill's is located in Arizona and conducts business in Arizona. The contract was accepted and signed by Cohill's in Arizona and it contemplated performance taking place in Arizona. *See Restatement (Second) Conflict of Laws* § 188 (stating that "place of contracting" is relevant factor and "the place of contracting is the place where occurred the last act necessary ... to give the contract binding effect"). Therefore, the Court finds that Arizona has the most significant relationship to the parties and the contract and that Arizona law applies.[1]

### III. Summary Judgment Standard

A court must grant summary judgment if the pleadings and supporting documents,

---

1. Neither party seriously disputes which state's laws should apply. QC states that either Arizona or California law applies and Cohill's assumes that Arizona law applies.

viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, the dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255, 106 S.Ct. 2505. Therefore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences

are to be drawn in his favor" at the summary judgment stage. *Id.*

## IV. Breach of Contract

QC and Cohill's have both moved for summary judgment on the issue of breach of contract. QC contends that Cohill's breached the parties' contract when it stopped purchasing products from QC in January 2003. Cohill's responds that QC lacked the capacity to contract with Cohill's and that if a valid contract ever existed a prior breach by QC excused Cohill's from performing. The Court concludes that a valid contract existed between the parties and there is uncontroverted evidence that QC breached that contract. Therefore, summary judgment will be granted in favor of Cohill's.

### A. Existence of Contract

It is undisputed that QC was not formally incorporated when L. Russell Ingersoll, on behalf of QC, and Michael Cohill, on behalf of Cohill's, signed the agreement in October 1998. QC was not organized as a distinct entity until August 24, 1999. Cohill's argues that this lack of formal existence prevents a finding that an enforceable contract exists. This is not a correct interpretation of Arizona law.

■ L. Russel Ingersoll, then the President of Bomanite Corporation, signed the contract on behalf of QC. At that time QC was a division of Bomanite. Ingersoll remained President of Bomanite through the time QC was formed as a separate entity. QC now asserts that Ingersoll was acting as a promoter when he signed the contract and that QC ratified the contract at a later date. In Arizona, a corporation has the power to ratify the pre-incorporation incorporation acts of a promoter.[2]

---

**2.** "Those who take an active part in organizing the corporation prior to its coming into being are called promoters of the corporation." *Malisewski v. Singer,* 123 Ariz. 195, 598 P.2d 1014, 1015 (1979). QC presented evidence that Ingersoll was the President of Bomanite when QC was created. There is a reasonable inference that Ingersoll took an active part in the formation of QC.

*John Deere Co. v. First Interstate Bank of Arizona N.A.*, 147 Ariz. 256, 709 P.2d 890, 894 (1985). The parties did not cite any Arizona case law addressing what qualifies as ratification. But according to *Fletcher Cyclopedia of the Law of Private Corporations* § 209, "ratification must occur via some affirmative and unequivocal action in recognition of the contract." *See also Ong Hing v. Arizona Harness Raceway, Inc.*, 10 Ariz.App. 380, 459 P.2d 107, 113 (1969) (citing *Fletcher* on issue of ratification). In this case, QC ratified the contract signed by Ingersoll by performing on the contract through 2002. (Stegemiller Dec. ¶ 10) In fact, from 1998 through 2002 it appears that both parties operated under the assumption that the contract was valid.[3] The Court finds that there is no genuine issue of material fact regarding QC's ratification.

### B. Prior Breaches

Having established that a valid contract existed between the parties, the question is whether either party breached that contract. The parties' contract contained two references to the exclusive nature of QC and Cohill's relationship. The contract provided that QC would provide its line of products "exclusively to Cohills" and it would "provide exclusive support and material sales to Cohills towards developing the market for [QC's products]." Cohill's claims that immediately after the parties' entered into their agreement, and continuing for the entire time the agreement was in effect, QC breached the exclusivity portions of the agreement by selling its products to other businesses in Arizona. Cohill's claims that it did not know the extent of QC's sales to other businesses in Arizona until the present litigation. In re-

sponse, QC does not dispute that these sales occurred, but argues that Cohill's waived its right to assert this argument by continuing to perform under the contract after it became aware that the sales were taking place. QC also claims that Cohill's breached the agreement in 2003 by failing to purchase "100% of its annual requirements for synthetic iron oxides" and other concrete coloring products and by "failing to use its best efforts . . . to develop the marketplace throughout the State of Arizona" for QC's products. (Doc. 1) Because QC violated the exclusivity portions of the parties' agreement, summary judgment will be granted in favor of Cohill's.

 In 1998, the Arizona Supreme Court quoted approvingly from the *Restatement (Second) of Contracts* (hereinafter "Restatement") § 237. *O'Day v. McDonnell Douglas Helicopter Co.*, 191 Ariz. 535, 959 P.2d 792, 795 (1998). That section of the Restatement states, in relevant part, "it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." *Id.* (quoting *Restatement* § 237). In other words, "a defendant who refuses to perform and is sued for breach of contract should be excused from liability if the plaintiff has personally failed in a material particular to perform the contract, although the defendant, at the time of his or her refusal to perform or continue performance, was ignorant of the plaintiff's prior breach." *Williston on Contracts* § 43:12 (citing *Restatement* § 237). The parties agree that the contract provided

---

3. There is now a dispute over the extent of each parties' performance under the contract and whether certain portions of the contract were violated by either party. These are issues regarding possible *breaches* of the con-

tract, not issues regarding ratification. There is ample evidence of QC's intent to be bound by the contract and the Court concludes that ratification occurred.

Cohill's would be the exclusive recipient of QC products in Arizona. The parties also agree that QC made a number of sales in Arizona to businesses other than Cohill's. According to QC, Cohill's knew that these sales were taking place and waived its objection to them. Cohill's concedes that it authorized *some* sales to two companies but claims that the vast majority of the sales were unknown and unauthorized. Having carefully analyzed the evidence submitted by both parties, the Court concludes that QC breached the contract.

Cohill's Motion for Summary Judgment included a copy of QC's response to a set of non-uniform interrogatories. (Cohill's SOF Ex. G) In that response, QC admitted that between 1999 and 2002 it sold products to over ten companies in Arizona: Border Products, Meadow Valley Contractors, Progressive Concrete, White Cap, Cemrock Landscapes, Larson Company, Orco, United Metro Materials, Carter Waters Corp, Concrete Construction Supply, Creative Concrete, HCS Cutler, and Twenty One Tech. Cohill's admits that it gave permission for QC to sell to Border Products and United Metro Materials. (Michael Cohill Affidavit ¶ 8) But Cohill's disputes that it gave permission for QC to sell to any of the other companies. In his affidavit, Michael Cohill states that Cohill's gave permission to QC on only two occasions to sell its products to other businesses. (Cohill's Supp. SOF Ex. A) The other sales, according to that affidavit, were neither known nor authorized by Cohill's. Therefore, Cohill's believes that the sales by QC to the other companies constituted a breach of the parties' agreement

that excused Cohill's of further obligations under the contract.

■ In responding to Cohill's argument, QC asserts in its Statement of Facts that "[t]o the extent that QC sold [to] entities other than Cohills from 1998 through January 2003, QC had permission from Cohills to do so." (QC SOF ¶ 27) QC references the deposition testimony of two witnesses in support of this statement. But that testimony does not support QC's broad claim. The testimony provides evidence that Cohill's consented to QC selling products to Border Products and Twenty One Tech, but no mention is made of the sales to other businesses.[4] Thus, the Court is left with uncontroverted evidence that in 2000 QC sold its products to numerous businesses in Arizona other than Cohill's. Because QC breached the contract as early as 2000, QC may not now seek recovery for alleged breaches by Cohill's between 2000 and 2003. Cohill's may, however, seek recovery for QC's breach.[5] *See Restatement* § 237 cmt. c ("If the other party is discharged as the result of an unjustified material failure of which he is ignorant, he has a claim for damages for total breach.").

Cohill's is entitled to summary judgment that QC breached the parties' agreement. Because Cohill's did not submit sufficient evidence as a matter of law regarding the amount of damages, a genuine issue of fact remains on this issue.

## V. Economic Loss Rule

Cohill's has moved for summary judgment on counts two, three, and four of QC's complaint. These counts consist of claims for interference with business rela-

---

4. According to the Rules of Practice of the United States District Court for the District of Arizona 56.1, a party's summary judgment motion must be supported by "specific facts" and the party must "refer to a specific portion of the record where the fact may be found (i.e., affidavit, deposition, etc.)."

5. The Court expresses no opinion about the proper period for which Cohill's may recover damages. Cohill's recovery may be limited to the period after QC's breach but before Cohill's alleged breach. This will be resolved at trial.

tionships, fraud and deceit, and unfair competition. According to Cohill's, the economic loss rule prevents QC from recovering on these counts. The Court agrees.

■ The economic loss rule, as formulated by the Arizona Court of Appeals, "bars a party from recovering economic damages in tort unless accompanied by physical harm, either in the form of personal injury or secondary property damage." *Carstens v. City of Phoenix*, 206 Ariz. 123, 75 P.3d 1081, 1083 (2003). The rule is based on the premise that "contract law and tort law each protect distinct interests. Generally, contract law enforces the expectancy interests between contracting parties and provides redress for parties who fail to receive the benefit of their bargain.... Tort law, in contrast, seeks to protect the public from harm to person or property." *Id.* Simply, "[u]nder the economic loss rule, a contracting party who suffers monetary harm (as opposed to

personal injury or injury to property other than that governed by the contract) cannot recover tort damages from the other contracting party but, rather, is limited to contract remedies." Edward P. Ballinger, Jr. & Samuel A. Thumma, *The History, Evolution and Implications of Arizona's Economic Loss Rule*, 34 Ariz. St. L.J. 491 (2002).

■ In this case, counts two, three, and four of QC's complaint are tort claims alleging only economic damages.[6] For example, count two of the complaint alleges that Cohill's interfered with QC's business relationships by representing that it was marketing QC's products to Arizona customers while it was actually marketing a competitor's product. This action allegedly damaged QC "in an amount ... believed to be in excess of $1,000,000.00." (Doc. 1) This purely economic harm resulting from actions that were breaches of the parties' contract falls squarely under the economic loss rule.[7] Accordingly, Cohill's is entitled

**6.** Interference with business relationships, fraud and deceit, and unfair competition are all classified as tort claims under Arizona law. *See Fillmore v. Maricopa Water Processing Systems, Inc.*, 211 Ariz. 269, 120 P.3d 697, 704 (2005) (providing elements for tort of intentional interference with business relationship); *Haisch v. Allstate Ins. Co.*, 197 Ariz. 606, 5 P.3d 940, 944 (2000) (providing elements for tort of fraud); *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 122, 970 P.2d 954, 956 (1998) (stating unfair competition "encompasses several tort theories").

**7.** QC cites the unpublished decision *Aventis Technologies Corp. v. JP Morgan Chase Bank*, 2004 U.S. Dist. Lexis 8302, for the proposition that the economic loss rule does not bar QC's fraud claim. (The Ninth Circuit "frowns upon citation to unpublished materials," but there is no firm rule preventing this Court from addressing unpublished authority. *United States ex rel. Rosales v. San Francisco Housing Auth.*, 173 F.Supp.2d 987, 1008 (N.D.Cal.2001).) In *Aventis*, the court held that if the economic loss rule were applied "there would be no remedy for fraud, nor any remedy for negligent misrepresentation." *Id.*

at *8. The court concluded that Arizona courts have not given the economic loss rule such a broad reading. In support, the *Aventis* court cited an Arizona Supreme Court case from 2000 that allowed a negligent misrepresentation claim seeking purely pecuniary damages. *Lombardo v. Albu*, 199 Ariz. 97, 14 P.3d 288 (2000). In that case the Arizona Supreme Court did not mention the economic loss rule, but the *Aventis* court reasoned that "it would be curious for a unanimous Arizona Supreme Court" to address the merits of the claim "if the claim were barred by another doctrine of Arizona law." *Aventis*, 2004 U.S. Dist. Lexis 8302, * 10. The *Aventis* court, however, did not recognize that an important aspect of the economic loss rule is privity. Edward P. Ballinger, Jr. & Samuel A. Thumma, *The History, Evolution and Implications of Arizona's Economic Loss Rule*, 34 Ariz. St. L.J. 491, 504 (2002). In the Arizona Supreme Court case mentioned by the *Aventis* court (as well as in *Aventis* itself), there was no privity of contract between the parties. (The lack of privity of contract was not mentioned by the Arizona Supreme Court in *Lombardo*.) In this case, however, there is a contract delin-

to summary judgment on these counts. Because the Court has determined that QC may not recover for its breach of contract claim, the application of the economic loss rule bars all of QC's claims for recovery.

The economic loss rule also applies to Cohill's second counterclaim of intentional interference with prospective contractual relations. (Doc. 5) Thus, Cohill's may not recover under that claim.

Accordingly,

IT IS ORDERED QC's Motion for Summary Judgment (Doc. 46) is DENIED.

IT IS FURTHER ORDERED Cohill's Motion for Summary Judgment (Doc. 72) is GRANTED IN PART. QC breached the contract and may not seek recovery for subsequent breaches by Cohill's. Also, counts two, three, and four of QC's complaint are barred by the economic loss doctrine. Cohill's may not recover under its counterclaim of intentional interference with prospective contractual relations and the issue of Cohill's recoverable damages, however, must be determined at trial.

IT IS FURTHER ORDERED the parties file the Joint Proposed Pretrial Order by April 21, 2006.

IT IS FURTHER ORDERED the Final Pretrial Conference shall be held on May 25, 2006 at 1:30 pm.

eating the rights and duties of each party. Thus, the economic loss rule applies and QC may not assert tort claims for its purely pecuniary damages.