Robert K. EVANS and Georgia
T. Evans, Plaintiff,

v.

Tina SINGER; John Wee; Jane Doe
Wee; Richard Hanten; Jane Doe
Hanten; Realty Experts, Inc.; Marie
Anne "Vickie" Shelley; John Doe
Shelley; Margaret Dixon; John Doe
Dixon; Arizona Properties and Relo-
cation, LLC d/b/a Prudential–Arizona
Properties, Defendants.

No. CV–06–00706–PHX–SRB.

United States District Court,
D. Arizona.

Sept. 28, 2007.

Christopher Alan Lavoy, Lavoy & Chernoff PC, Phoenix, AZ, for Plaintiff.

Richard Lorenzen, Perkins Coie Brown & Bain PA, Marc Allen Erpenbeck, Patrick Joseph Paul, Snell & Wilmer LLP, Robert J. Spurlock, Bonnett Fairbourn Friedman & Balint PC, Phoenix, AZ, for Defendants.

## ORDER

SUSAN R. BOLTON, District Judge.

Pending before the Court is Defendants John and Jane Doe Wee, Richard and Jane Doe Hanten, and Realty Experts, Inc.'s (collectively the "Realty Defendants") Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 45). Plaintiffs have alleged a single cause of action against the Realty Defendants, Count VI–Negligence. The Realty Defendants contend that Plaintiffs have failed to state a claim on which relief can be granted because Arizona's economic loss rule precludes tort recovery in this case.

## I. BACKGROUND

Plaintiffs, who are California residents, purchased a Tempe, Arizona self-storage facility from Defendant Tina Singer in late 2005. (Second Am. Compl. ("SAC") ¶ 16.) The commercial real estate purchase contract (the "Contract"), which is part of the record before the Court, specified a purchase price of $3 million. (John and Jane Doe Wee, Richard and Jane Doe Hanten, and Realty Experts, Inc.'s Mot. to Dismiss Pls.' SAC ("MTD"), Ex. A.) Plaintiff was represented in the transaction by Defendant real estate agent John Wee, who was working in conjunction with Defendant

designated broker Richard Hanten. (SAC ¶ 17.) Both Mr. Wee and Mr. Hanten are employees of Defendant Realty Experts, Inc. (SAC ¶ 17.)

Plaintiffs allege that the decision to purchase the storage facility was premised on certain representations made by Ms. Singer and her real estate agent, Ms. Shelly, regarding the revenues, occupancy, and profitability of the business. (SAC ¶ 18.) Ms. Singer allegedly represented to Plaintiffs that the facility had an occupancy rate of over 90% and that revenues for 2003 and 2004 were $337,987 and $381,300 respectively. (SAC ¶ 19–20.) Once Plaintiffs took possession of the storage facility they determined that many of the representations made by Ms. Singer were false. (SAC ¶ 21.)

Plaintiffs claim that less than 50% of the storage units were leased to paying customers. (SAC ¶ 22.) Based upon documents filed in an earlier bankruptcy by Ms. Singer, Plaintiffs believe that the revenues for 2003 were in fact $242,756, not the $337,987 represented at the time of the sale. (SAC ¶ 23.) In addition, Plaintiffs allege that "Ms. Singer pad locked empty units and listed them as rented on the 'rental roll.'" (SAC ¶ 24.) Plaintiffs claim that "[u]nits where the renters had stopped paying rent and abandoned what amounted to junk in the units were listed on the 'rental roll' without any notation of the default." (SAC ¶ 24.) Also, Plaintiffs aver that "Ms. Singer was storing her own possessions in units that were listed on the 'rental roll' as rented to customers." (SAC ¶ 24.) Finally, Plaintiffs allege that Ms. Singer "collected rent not due until after the closing of the sale in advance thereof without telling the [Plaintiffs] and without paying the post-closing portion of the rents to them." (SAC ¶ 25.)

Based upon these facts, Plaintiffs claim that the Realty Defendants were negligent in performing the services for which they were hired. (SAC ¶ 44–51.) Plaintiffs believe that the Realty Defendants owed them a duty of care that includes: (1) providing services that meet "the standards of practice and competence recognized in the professional community for the specific real estate discipline in which [Plaintiffs' agent] was engaged"; (2) "an affirmative duty not to provide professional services concerning a type of property or service that was outside [Plaintiffs' agent's] field of competence without engaging the assistance of a person who was competent to provide those services"; and (3) "a duty to exercise reasonable care in ensuring that information material to the [Plaintiffs'] interests and relevant to the transaction was obtained and accurately communicated to the Plaintiffs." (SAC ¶ 45–47.) Plaintiffs allege that the Realty Defendants breached their duty of care in each of these instances. (SAC ¶ 48.)

The Realty Defendants respond that even if all of these facts are true, Plaintiffs are not entitled to recover under the law of negligence because Plaintiffs have experienced purely economic losses, and, the Realty Defendants argue, in such a situation the economic loss rule precludes recovery in tort and restricts Plaintiffs to contract remedies. (MTD at 1.) Additionally, the Realty Defendants contend that Plaintiffs explicitly released them from any liability concerning the financial condition of the business. (MTD at 3.)

## II. LEGAL STANDARDS AND ANALYSIS

The Federal Rules of Civil Procedure require a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8; *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248 (9th Cir.1997). Thus, dismissal for insufficiency of a complaint is proper if, on its face, the complaint fails to state a claim.

*Lucas v. Bechtel Corp.*, 633 F.2d 757, 759 (9th Cir.1980). A Rule 12(b)(6) dismissal for failure to state a claim can be based on either: (1) "the lack of a cognizable legal theory"; or (2) insufficient facts to support a "cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1990); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

■ In determining whether a complaint states a valid claim, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir.1994). As for the factual allegations, the Supreme Court has explained that they "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). In ruling on a motion to dismiss, " 'the issue is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.' " *Gilligan*, 108 F.3d at 249 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## A. Release of Liability in the Contract

■ Where a provision in an Arizona residential real estate contract purports to release the vendor's and purchaser's brokers from liability for negligence, it will only be enforceable if evidence supports the conclusion that the release was a negotiated term—not merely boilerplate language present in a standard form contract. *Aranki v. RKP Invs., Inc.*, 194 Ariz. 206, 979 P.2d 534, 537–38 (Ariz.Ct.App.1999). Among the principal policy reasons supporting this rule is that Arizona "law disfavors contractual provisions by which one party seeks to immunize himself against the consequences of his own torts." *Id.* at

537. Releases of this type are not categorically disallowed; they are permitted when "there is no public policy impediment to the limitation" and where it is shown that "the parties· did, *in fact*, bargain for the limitation." *Id.*

The plaintiffs in *Aranki* were purchasers of a single family residence who "discovered many latent defects and problems with the home after the sale closed." *Id.* at 535. They then brought suit against the sellers, sellers' brokers, and their own brokers alleging, among other things, that their real estate agents were negligent. *Id.* The buyers' agents moved for summary judgement relying, in part, on a clause in the sales contract which claimed to release the brokers from liability "for the· condition of the premises." *Id.* In its analysis, the court highlighted several factors which undermined the likelihood that the release was actually negotiated· between the parties. *Id.* at 537–38. First, the court noted that "[t]he exculpatory provisions appear in six lines on the sixth page of a seven page standard form contract 'approved' by the Arizona Association of Realtors." *Id.* The opinion then highlighted the absence of the parties' initials next to the release and concluded that "there is no evidence that this provision was discussed or negotiated." *Id.* at 538.

■ Here, both parties rely solely on *Aranki*, yet draw opposite conclusions from its holding. The Realty Defendants argue that the release in the Contract can be distinguished from *Aranki* because the Contract was for commercial real estate, not residential. Also, the Realty Defendants emphasize that Plaintiffs placed their initials next to the release. These arguments miss the point. The *Aranki* court held that the release was not enforceable "because [the terms] do not appear to be negotiated." *Id.* Therefore, the appropriate inquiry must be one that

assesses whether the release was in fact negotiated. That this case involves a commercial real estate transaction does suggest some level of sophistication beyond that present in a typical residential transaction, but does not create a presumption that the release was negotiated. In addition, the presence of Plaintiffs' initials next to the release leads the Court to conclude that this term was highlighted, but it does not show that it was negotiated.

■ The relevant language from the Contract reads:

> Release of Brokers: SELLER AND BUYER HEREBY ACKNOWLEDGE THAT THEY HAVE BEEN AND ARE NOW ADVISED BY THE BROKER(S) TO CONSULT AND RETAIN THEIR OWN EXPERTS TO ADVISE AND REPRESENT THEM CONCERNING THE LEGAL AND INCOME TAX EFFECTS OF THIS CONTRACT, AND THE CONDITION OF THE PROPERTY. SELLER AND BUYER HEREBY EXPRESSLY RELEASE, HOLD HARMLESS AND INDEMNIFY ALL BROKER(S) IN THIS TRANSACTION FROM ANY AND ALL LIABILITY AND RESPONSIBILITY REGARDING THE CONDITION, SQUARE FOOTAGE/ACREAGE, LOT LINES OR BOUNDARIES, VALUE, FINANCING, RENT ROLLS, INCOME AND EXPENSE PROJECTIONS OR PROFORMAS, ENVIRONMENTAL CONDITIONS, SANITATION SYSTEMS, ROOF CONDITION, WOOD INFESTATION AND WOOD INFESTATION REPORT, COMPLIANCE WITH BUILDING CODES, ZONING OR OTHER GOVERNMENTAL REGULATIONS, OR ANY OTHER MATERIAL MATTERS RELATING TO THE PROPERTY.

(MTD, Ex. A at 395–404.) The Contract here, like the one in *Aranki,* is of the pre-printed sort and similarly bears the approval of the Arizona Association of Realtors, indicating that it was not drafted for this specific transaction. There is no requirement that an original contract be drafted in order for a release to be enforceable, but, where public policy opposes such releases, the presence of a pre-printed form weighs against a conclusion that the release was negotiated.

Based upon the evidence before it, the Court is unable to conclude whether the release was a negotiated term. The Realty Defendants may present evidence on summary judgment or at trial supporting their position that the term was negotiated. Presently, where judgment is requested on the pleadings and without considering any evidence, the Court cannot determine whether the release precludes Plaintiffs' claims.

### B. The Economic Loss Rule

■ When applicable, "[t]he economic loss rule bars a party from recovering economic damages in tort unless accompanied by physical harm, either in the form of personal injury or secondary property damage." *Carstens v. City of Phoenix,* 206 Ariz. 123, 75 P.3d 1081, 1084 (Ariz.Ct. App.2003). Originally recognized in the area of products liability, the rule was fashioned to prevent tort law from intruding on and potentially enveloping contract law, including the law of warranty. *Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.,* 143 Ariz. 368, 694 P.2d 198, 208 (1984) *abrogated on other grounds by Phelps v. Firebird Raceway, Inc.,* 210 Ariz. 403, 111 P.3d 1003 (2005); *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In *East River,* a case where supertanker turbines malfunctioned causing damage only to themselves, the United States Supreme Court artfully warned that if prod-

ucts liability law "were allowed to progress too far, contract law would drown in a sea of tort." 476 U.S. at 860, 866, 106 S.Ct. 2295.

The principal public policy underlying the economic loss rule recognizes "that contract law and tort law each protect distinct interests." *Carstens,* 75 P.3d at 1084. Contract law focuses on "standards of quality as defined by the parties in their contract" while tort law "seeks to protect the public from harm to person or property." *Id.* Generally, tort law provides "duty-based recovery" while contract law allows for "promise-based recovery." *Id.* Contract law aims to "enforce the expectancy interests between contracting parties and provides redress for parties who fail to receive the benefit of their bargain." *Id.* Thus, in situations where parties normally specify the details of their agreement in contract—such as agreements concerning goods or construction of real property—it is reasonable to require those parties to seek remedies through contract when, at most, they have lost the benefit of their bargain. By examining the contract, the parties can then determine whether the performance was rendered in the manner specified and, if contractual provisions are not met, what redress is available under the same. If a party elects to waive a contractual remedy during contract formation—for example to obtain a better price—then it is important that the parties be restricted to the remedies set forth in the agreement when faced with pure economic loss; any other result would destroy the bargain. *See Giles v. Gen. Motors Acceptance Corp.,* 494 F.3d 865, 875 (9th Cir.2007) (quoting *All–Tech Telecom, Inc. v. Amway Corp.,* 174 F.3d 862, 865–66 (7th Cir.1999) (Posner, J.) (noting that where "well-developed contractual remedies," such as those found in the UCC, exist, "tort remedies would duplicate the contract remedies, adding unnecessary complexity to the law ... [and]

duplicative tort remedies would undermine contract law")).

It is easy to see, however, that the economic loss rule cannot simply be applied as a blanket restriction precluding tort-based lawsuits by plaintiffs who have suffered solely economic loss. *See Giles,* 494 F.3d at 875 (explaining that "[t]ort law has traditionally protected individuals from a host of wrongs that cause only monetary damage."). For instance, in some professional negligence actions, such as legal malpractice, damages rarely include physical harm to person or property, yet this tort is universally recognized. In the overwhelming majority of situations, business torts, including legal malpractice and fraud, among others, exist solely to redress pure economic loss. *See id.* (collecting cases from outside Arizona where courts have refused to apply the economic loss rule to preclude tort claims for pure economic harm); *KD & KD Enters., LLC v. Touch Automation, LLC,* 2006 WL 3808257, at *1–3 (D.Ariz. Dec. 27, 2006) (allowing claim for fraud in the inducement where parties were in contractual privity and plaintiff experienced pure economic loss); *Giles Constr., Inc. v. Commercial Fed. Bank,* 2006 WL 2711501, at *10 (D.Ariz. Sept. 21, 2006) (concluding that "[o]ther than construction and product defect cases, however, the Arizona courts have not applied the economic loss rule as a bar to the recovery of economic damages in tort cases.").

The Realty Defendants argue that numerous recent United States District Court decisions from the District of Arizona support their position that the economic loss rule applies to the instant case. In part, the Realty Defendants are correct that many of these district court cases can be read to support their position. However, when sitting in diversity, "state courts' interpretations of [state] law are binding on [federal] courts." *Powell v. Lambert,*

357 F.3d 871, 874 (9th Cir.2004). After a thorough review of the controlling state law, the Court concludes that Arizona courts do not read the economic loss rule as broadly as some of the recent federal district court decisions have asserted. While the Arizona Supreme Court may choose at some future date to give a broad reading to the economic loss rule, it has yet to do so. In situations " '[w]here the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it.' " *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir.2001) (citation omitted). However, "[i]n assessing how a state's highest court would resolve a state law question-absent controlling state authority-federal courts look to existing state law *without predicting potential changes* in that law." *Id.* (emphasis added).

Recently, the Ninth Circuit observed that "outside the product liability context, the [economic loss] doctrine has produced difficulty and confusion." *Giles*, 494 F.3d at 874. The *Giles* court then noted a recent Florida Supreme Court decision where one justice reflected, " 'the [economic loss] rule has been stated with ease but applied with great difficulty.' " *Id.* (quoting *Indem. Ins. Co. v. Am. Aviation, Inc.*, 891 So.2d 532, 544 (Fla.2004) (Cantero, J., concurring)). Arizona legal commentators who had earlier pointed to Florida law as a stable guide relied upon by Arizona courts in "construing Arizona's economic loss rule, absent definitive guidance in Arizona," now recognize that due to recent decisions, Florida's economic loss rule has become " 'a confusing morass.' " Eddward P. Ballinger, Jr. & Samuel A. Thumma,

*The Continuing Evolution of Arizona's Economic Loss Rule*, 39 Ariz. St. L.J. 535, 563–64 (2007) (hereinafter "Ballinger & Thumma II") (quoting *Indem. Ins.*, 891 So.2d at 544); *compare* Eddward P. Ballinger, Jr. & Samuel A. Thumma, *The History, Evolution, and Implications of Arizona's Economic Loss Rule*, 34 Ariz. St. L.J. 491, 505 (2002) (hereinafter "Ballinger & Thumma I") (observing that two different courts relied on Florida law to help guide the application of the Arizona economic loss rule due to similarities between the two). It seems that with the recent flurry of Arizona federal district court decisions,[1] Arizona may find itself in an equally precarious quagmire absent an authoritative pronouncement by its appellate courts. To fully understand how Arizona courts and Federal courts have drifted apart in their handling of this issue, it is necessary to briefly examine the evolution of the rule.

Two years before the United States Supreme Court decided *East River*, the Arizona Supreme Court reached a similar conclusion in *Salt River Project*, a products liability action stemming from the malfunction of an LMC unit, a component of a power generation plant. 694 P.2d at 210. In *Salt River Project*, the court laid out five hypothetical situations to illustrate how the economic loss rule should be applied in products liability cases. *Id.* at 208. First, the court addressed the two hypotheticals where personal injury or property damage resulted, concluding that where a "defect is unreasonably dangerous to person or property and caus[es] accidental damage to other property" or to some person, those damages are redressable through tort. *Id.* Next, the court exam-

---

**1.** Since the publication of their 2002 article, Ballinger & Thumma note that Arizona has experienced a "literal explosion of ... cases addressing the [economic loss rule]." Ballinger & Thumma II, *supra*, at 535. The authors estimate that "there are now approximately a dozen additional cases applying Arizona's Doctrine" which have "created some additional confusion." *Id.* at 539.

ined the situation where a product only damages itself. Recognizing a split of authority given these facts, the court held that where a product is unreasonably dangerous and the loss occurs in a sudden, unpredictable manner then strict tort liability attaches. However, where the product presents no unreasonable risk, "then UCC remedies will generally be appropriate and exclusive for recovery of the damage to the defective product itself." *Id.* at 209. In contrast to those courts taking a broad view of the economic loss rule—i.e., invoking its bar whenever a product only damages itself—Arizona opted for a case-by-case approach that allows the trial court to assess the inherent, yet unrealized, danger that the product posed to life or property. *Id.* at 208–09.

In each of the final two examples, the hypothetical plaintiff experienced pure economic loss when the product failed to perform properly but was not physically damaged. *Id.* Thus, the only damages were in the form of product repair and replacement costs, lost profits, and increased exposure to litigation. *Id.* Again the Arizona Supreme Court took a more restrictive approach—a position that contrasts with the majority rule which holds that "economic losses such as those [in hypotheticals] # 4 and [ ]# 5 are not recoverable in tort." *Id.* at 209. Explaining its position, the court wrote: "[r]ather than adopting the majority rule as a blanket disallowance of tort recovery for economic losses, we think the better rule is one which examines the loss in light of the nature of the defect that caused it, the manner in which it occurred, and the nature of any other contemporaneous losses." *Id.* When assessing pure economic loss, the court indicated that it would first

examine whether there was any accompanying loss where "the defect presented a real danger of harm to person or other property, an 'accident' did occur, the damage was of the type recognized as 'tort damage' (harm to person or other property), or if some combination of these factors preponderates." *Id.* at 210. If the aforementioned factors are found to be present, then "tort remedies will be available." *Id.* Although the court provided this framework to handle the more straightforward cases, it acknowledged that "few cases conform neatly to an 'all or nothing' configuration." *Id.* The court then devised a three-step test to assist trial judges when making determinations in difficult cases. *Id.* When considering the evidence, the following three factors should be addressed by the trial court: "1) the nature of the product defect, 2) the manner in which the loss occurred, and 3) the types of loss or damage that resulted." *Id.* Based upon this information the court can determine whether tort liability is proper. *Id.*

On its face, the *Salt River Project* decision appears to be limited to cases where products are involved—principally because the court repeatedly framed its analysis in terms uniquely applicable to that context. However, Arizona state appellate courts have not limited their application of the economic loss rule to cases involving products. The rule has been widely discussed and implemented in construction defects cases as well. In total, the economic loss rule, in its two distinct contexts, has been addressed in eight separate published opinions from the Arizona appellate courts.[2] *See generally Flory v. Silvercrest Indus., Inc.*, 129 Ariz. 574, 633 P.2d 383

**2.** In *Kana, Inc. v. Burger King, Corp.*, the Arizona Court of Appeals applied the economic loss rule to bar a negligent misrepresentation claim that arose outside of the products

or construction defects context. Ballinger & Thumma I, *supra*, at 499. The *Kana* decision was later de-published, thus, it lacks precedential value.

(1981) (products liability, defective mobile home); *Woodward v. Chirco Constr. Co., Inc.*, 141 Ariz. 514, 687 P.2d 1269 (1984) (construction defects); *Nastri v. Wood Bros. Homes, Inc.*, 142 Ariz. 439, 690 P.2d 158 (Ariz.Ct.App.1984) (construction defects); *Salt River Project*, 694 P.2d 198 (products liability, power plant component); *Colberg v. Rellinger*, 160 Ariz. 42, 770 P.2d 346 (Ariz.Ct.App.1988) (construction defects); *Carstens*, 75 P.3d 1081 (construction defects); *Hayden Bus. Ctr. Condo. Ass'n v. Pegasus Dev. Corp.*, 209 Ariz. 511, 105 P.3d 157 (Ariz.Ct.App.2005) (construction defects); *Evans Withycombe, Inc. v. W. Innovations, Inc.*, 212 Ariz. 462, 133 P.3d 1168 (Ariz.Ct.App.2006) (construction defects). It appears that no reported Arizona state appellate court decision has ever applied, or even discussed, the economic loss rule outside of the areas of products liability or construction defects.

In *Woodward*, the Arizona Supreme Court delineated the boundaries between contract and tort causes of action in construction defects cases to resolve the parties' dispute over whether to apply a contract or tort statute of limitations. 687 P.2d at 1270–71. Without actually discussing the economic loss rule by name, the court held that a "purchaser of a home can seek to recover in contract for defects in the structure itself as such defects render the home less than the purchaser bargained for." *Id.* at 1271. In tort, a plaintiff is restricted to recovering "for injuries sustained due to the contractor's failure to construct the home as a reasonable contractor would." *Id.* To illustrate its point, the court explained, "[f]or example, if a fireplace collapses, the purchaser can sue in contract for the cost of remedying the structural defects and sue in tort for damage to personal property or personal injury caused by the collapse." *Id.* Although both *Woodward* and *Nastri*, an Arizona Court of Appeals construction defects case

that relied on *Woodward*, were decided just months before *Salt River Project*, no mention of either case was made in the *Salt River Project* opinion. *Colberg*, a construction defects case decided four years after *Woodward*, *Nastri*, and *Salt River Project*, also made no reference to *Salt River Project*, yet relied heavily on the reasoning set forth in *Woodward*, and also looked to *Nastri* for support. The independent development of the economic loss rule case law in the distinct areas of construction defects and products liability demonstrates that economic loss is not a concept that easily migrates from one unique factual circumstance to another. Rather, it is a precise tool used to uphold traditional separation between contract and tort in areas of the law that are particularly susceptible to blurring of the two.

In 1994, the Ninth Circuit addressed Arizona's economic loss rule in *Apollo Group, Inc. v. Avnet, Inc.*, 58 F.3d 477 (9th Cir.1995). In *Apollo*, the purchaser of a computer hardware system pursued contract and tort claims based on the seller's alleged misrepresentations concerning the system's capabilities where its inability to properly run the buyer's financial software resulted in significant economic losses. *Id.* at 478–79. Relying on *Salt River Project*, the court wrote that the Arizona Supreme Court "reads the 'economic loss' rule broadly." *Id.* at 480. Later in the decision the court again referenced the "broad language of *Salt River Project*," yet provided no citation to this "broad language," leaving this Court to ponder precisely where such language is found. *Id.* As discussed above, *Salt River Project* provided anything but a broad reading of the economic loss rule. In the final two hypotheticals, which were particularly susceptible to a broad interpretation, the court instead opted for a more conservative approach, rejecting "the majority rule as a blanket disallowance of tort recovery for

economic losses." *Salt River Project,* 694 P.2d at 209. Since *Apollo,* the Ninth Circuit has yet to again confront Arizona's product-related economic loss rule, and it has never spoken on Arizona's construction defects application of the rule. However, in a 2007 case construing Nevada's economic loss jurisprudence, the Ninth Circuit reflected on the unnecessarily confusing state of the economic loss rule in many jurisdictions. *Giles,* 494 F.3d at 874–75. Pointing to overly broad statements as a cause of such confusion, it singled out *Apollo* as a chief contributor to the difficulty. *Id.* The *Giles* court identified the following language from *Apollo* as problematic: " 'Generally, under the 'economic loss' rule, a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort.' " *Id.* (quoting *Apollo,* 58 F.3d at 479). Directly following the citation where this quote appears, the court opined, "[s]uch broad statements are not accurate. Tort law has traditionally protected individuals from a host of wrongs that cause only monetary damages." *Id.* at 875.

However, the *Apollo* decision itself was not the problem—by all accounts it reached the proper result—it was the language and the rationale used to get there that has created confusion. The *Apollo* court found in favor of the defendant, Avnet, holding that the economic loss rule precludes Apollo's attempts to recast its contract-based breach of warranty claim into one for tort-based negligent misrepresentation where it only lost the benefit of its bargain. To reach that conclusion, the court was required to decide a question that it believed the "Arizona courts had yet to rule on." *Apollo,* 58 F.3d at 480. Specifically, the tort cause of action brought in *Apollo*—negligent misrepresentation—is different from that asserted in *Salt River Project*—strict products liability—and thus the three-part test, which was intended to apply to defective prod-

ucts, was inapposite. While the three-part test was inapplicable, the logic underlying *Salt River Project* was directly on point. The policy considerations underlying the economic loss rule in products cases, regardless of whether the claim is based upon defects or misrepresentations, include "benefit of the bargain" considerations, where parties are bound by their agreed-to contractual allocation of risks, and recognition that when the UCC applies, parties are bound by those commercial provisions that the legislature deemed appropriate. Discussing the relevance of the UCC to the economic loss rule, the Ninth Circuit wrote that " '[w]here there are well-developed contractual remedies, such as the remedies that the Uniform Commercial Code (in force in all U.S. states) provides for breach of warranty of the quality, fitness, or specifications of goods, there is no need to provide tort remedies for misrepresentation.' " *Giles,* 494 F.3d at 876 (quoting *All–Tech,* 174 F.3d at 865–66).

In the wake of *Apollo,* U.S. District Courts have issued no fewer than thirteen decisions discussing Arizona's economic loss rule, many of them expanding the application of the rule beyond those limited circumstances articulated in *Salt River Project* and *Woodward. See generally* Ballinger & Thumma I, *supra* (collecting Arizona economic loss cases from 2002 and earlier); Ballinger & Thumma II, *supra,* (collecting Arizona economic loss cases from 2002 through 2007); *see also In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 107 F.Supp.2d 841, 861–62 (W.D.Mich. 2000) (relying on *Apollo's* broad interpretation of Arizona's economic loss rule and holding that the plaintiff's negligent misrepresentation claims were bared in an action brought by life insurance policyholders against their insurer); *Pegasus LLC v. Heil Co., Inc.,* CV–96–2851 PHX–JWS, (Doc. 148) slip op. (D.Ariz. April 2, 1999)

(adopting *Apollo's* broad reading of *Salt River Project* and applying Arizona's economic loss rule to preclude the plaintiff's breach of fiduciary duty claim arising out of an alleged oral joint venture agreement); *Marks v. Citizens Commc'n Co.*, CV–00–2333 PHX–SMM, (Doc. 143) slip op. (D.Ariz. July 21, 2003) (looking to *Apollo* for support and concluding that the economic loss rule prevents the plaintiffs conversion claim alleging that the defendant exercised unauthorized control over the plaintiff's vested stock options where those options were subject to a contract, and plaintiff also asserted breach of that contract); *Wojtunik v. Kealy*, 394 F.Supp.2d 1149, 1171 (D.Ariz.2005) (relying, in part, on *Apollo's* statement that Arizona reads the economic loss rule broadly to find that, in a securities fraud action, the rule bars the plaintiff's negligent misrepresentation claim against an inside director); *In re Gosnell Dev. Corp. of Ariz.*, 2007 WL 1238923, at *3 (D.Ariz. April 27, 2007) (observing that no Arizona court has applied the economic loss rule to a limited partnership, but doing so, in part, because of *Apollo's* declaration that Arizona reads the rule broadly). To some extent, the justification for many of these expansive readings is attributable to the pronouncement in *Apollo* that Arizona courts "read[ ] the 'economic loss' rule broadly." 58 F.3d at 480. However, four district court decisions have questioned the broad reading of Arizona's economic loss rule.

In *Aventis Technologies Corp. v. JP Morgan Chase Bank*, 2004 WL 5137578, 2004 U.S. Dist. LEXIS 8302 (D.Ariz. Jan. 26, 2004), the court held that the economic loss rule did not prevent Aventis from suing JP Morgan for negligent misrepresentation regarding information it provided which was later relied on by Aventis when entering a contract with a third party.[3] Aventis rejected a broad reading of the economic loss rule writing, "[w]ere the economic loss rule given the breadth ascribed to it by JP Morgan ... there would be no remedy for fraud, nor any remedy for negligent misrepresentation. Yet, this is not the law of Arizona." *Id.* at *3, 2004 U.S. Dist. LEXIS 8302 at *9.

*KD,* a case where the plaintiff alleged that the defendant had fraudulently induced it to enter into a contract for the purchase of an automated DVD sales system, rejected the defendant's argument that Arizona's economic loss rule precludes such a claim. 2006 WL 3808257, at *1–3. The court cautioned against defendant's attempt to extend the economic loss rule to fraud and warned that "[t]his logical leap would basically eviscerate the tort of fraud, for the only damages one has in fraud are economic. The law cannot be so twisted." *Id.* at *1. *Moshir v. PatchLink Corp.*, 2007 WL 505344, at *5–6 (D.Ariz. Feb. 12, 2007), a second case discussing the economic loss rule's relevance to the tort of fraud, determined that "the economic loss rule has no application to the tort of fraud under Arizona law." The

---

3.  *Aventis* was later criticized by *QC Constr. Prods., LLC v. Cohill's Bldg. Specialties, Inc.*, 423 F.Supp.2d 1008, 1015 n. 7 (D.Ariz.2006), for failing to "recognize that an important aspect of the economic loss rule is privity." *QC* concludes that the absence of privity explains the failure to apply the economic loss rule in the cases on which *Aventis* based its reasoning, not the inapplicability of the economic loss rule to negligent misrepresentation claims as *Aventis* determined. However,

in *Carstens*, a construction defects case, the Arizona Court of Appeals applied the economic loss rule to a plaintiff who was not in privity with the defendants. *Aventis* is neither a products case nor a construction defects case so it is unclear whether Arizona courts would apply the no-privity construction defects line of cases or the product defects line of cases where it appears that privity is required. Therefore *QC's* criticism of *Aventis* is equally amenable to attack.

court also noted that "Federal courts ... have extended the rule" beyond products liability and construction defects tort claims, but not state courts. *Id.*

The only district court case to squarely confront the overall treatment of the Arizona economic loss rule in Federal courts is *Giles Construction*, 2006 WL 2711501, at *9–10. There the court unabashedly opined that "Federal courts ... have construed Arizona's economic loss rule more broadly than the Arizona courts," resulting in a number of decisions that "are not firmly supported by Arizona law." *Id.* at *10. Also, the court noted that Arizona state appellate courts have never used the economic loss rule to bar tort claims outside of the construction defects and products liability areas. *Id.*

■■■ The Realty Defendants' Reply begins by arguing that, "Plaintiffs ask this Court to make an exception to the economic loss rule for negligence claims against a real estate salesperson. Such an exception is unwarranted." (John and Jane Doe Wee, Richard and Jane Doe Hanten, and Realty Experts, Inc.'s Reply in Supp. of Its Mot. to Dismiss Count VI of Pls.' Second Am. Compl. ("Reply") at 1–2.) In reality, Plaintiffs are not seeking an exception because, as the Arizona Supreme Court has observed, in Arizona there is no "blanket disallowance for tort recovery for economic losses." *Salt River Project,* 694 P.2d at 209. Instead it is the Realty Defendants who seek an exception in the form of an expansion of existing state law. Thus, the Court will address whether such an expansion is warranted.

■■■ To resolve the Realty Defendants' Motion to Dismiss, the Court, in essence, is asked to decide whether the contractual agreement between a real estate agent and her client is sufficiently similar to those situations where the Arizona Supreme Court has applied the rule to bar recovery of economic losses in tort. The Court

approaches this question by observing that Arizona courts have never viewed the economic loss rule broadly, instead they have limited its application to two distinct contexts. As an issue of first impression, it is incumbent on this Court to predict how the Arizona Supreme Court would handle this matter. Thus, as the Court examines the Realty Defendants' arguments, it will draw parallels between the instant facts and those facts present in products and construction defects cases to see whether the same concerns predominate.

First, the Realty Defendants argue that because "Plaintiffs have entered into contracts allocating the risks," they should not be permitted to assert claims in tort that would undermine those bargained-for allocations. (Reply at 4.) Further, the Realty Defendants contend that Plaintiffs had the opportunity to allocate those risks in contract, irrespective of whether they did so in the agreements. Plaintiffs respond that standards of quality are generally not specified in real estate agency contracts, which distinguishes them from products and construction agreements. Plaintiffs highlight the relative ease with which parties to construction and products contracts can "specify quality standards," and they argue that these standards are absent from real estate agency contracts, necessitating resort to a tort duty of reasonable care. (Pls.'s Resp. to Mot. to Dismiss ("Resp.") at 9.)

Both parties acknowledge the existence of two contracts, a "real estate retention agreement" and the Commercial Real Estate Purchase Contract. (Reply at 5.) Only the latter of these two agreements is part of the record before the Court, and the Court declines to speculate about the contents of a document that is outside of the record. The Purchase Contract says little about the parties' relationship and provides no insight into any allocations of

risk that may have been made. If the real estate retention agreement is, as Plaintiff alleges, little more than a statement that "the agent has been retained to sell or find a property," and such an agreement is characteristic of industry standards, then it could hardly be said that the parties had a real opportunity to allocate those risks. (Resp. at 9.)

The Realty Defendants next address Plaintiffs' argument that "expanding the economic loss doctrine to extinguish a negligence claim against one's real estate agent would effectively leave the client without a remedy." (Resp. At 10.) In response to this argument, the Realty Defendants direct the Court to *Carstens* where the Arizona Court of Appeals determined that "Arizona courts have never held that the application of the economic loss rule depends upon the plaintiff also having a viable contract claim against the defendant." 75 P.3d at 1085. The Court agrees that this maxim is equally applicable to Plaintiffs' facts. If the Court were to decide that policy considerations support using the economic loss rule to bar claims based upon the instant facts, then Plaintiffs' claims would fall to the terms of the contracts. If the contracts provide a remedy, then, of course, Plaintiffs would be able to pursue any available claims. If, however, Plaintiffs were left without a contractual remedy, then it would be a result of their own decision to accept such risks during contract formation. This argument weighs neither for nor against applying the economic loss rule in this case.

■ The Realty Defendants' third argument aims to controvert Plaintiffs' contention that "the economic loss rule generally does not apply where the duty of care derives from the common law." (Resp. At 10.) In opposition to this position, the Realty Defendants assert that the parties' duties arise from contract. Plaintiffs counter that real estate agents owe their clients a fiduciary duty, thus providing an additional justification for the application of tort law. Plaintiffs' initial argument, that the economic loss rule is inapplicable to claims premised on common law duties, finds no support in Arizona law. Plaintiffs' argument relies on quoted language from non-binding authority and cites to three Arizona cases, all of which are inapposite. (Resp. at 10.) Next, Plaintiffs direct the Court's focus to the fiduciary relationship that exists between a real estate agent and her client. *See Lombardo v. Albu*, 199 Ariz. 97, 14 P.3d 288, 290–91 (2000) (en banc) (recognizing that a real estate agent owes a fiduciary duty to her client). The Court finds this argument relevant because, in every case, a real estate agent owes her client this separate fiduciary duty, notwithstanding any duties that may arise from contract. As compared to products and construction, the recognition of this special legal relationship tends to weigh in favor of allowing tort recovery for economic losses. A breach of fiduciary duty oftentimes results not in physical harm to person or property, but, as in *Lombardo*, creates pure economic harm. Neither party alluded to a similar special relationship in the area of products liability or construction contracts.

Next, the Realty Defendants argue against, and Plaintiffs argue for, a determination that the economic loss rule does not apply to service contracts. In support of their position, Plaintiffs argue that "many states have recognized a general exception to the economic loss rule for service contracts." (Resp. at 11.) But, as the Realty Defendants point out, "Arizona is not one of those states." (Reply at 7–8.) Indeed, a failure to even consider the economic loss rule under these circumstances would depart substantially from the nuanced, fact-specific approach taken in *Salt River Project*. Furthermore, it would be easy to announce a rule precluding the

application of the Arizona economic loss rule in service contracts, however, the resulting expansion to Arizona law would exceed the Court's mandate to forecast the correct legal answer under Arizona law. It is clear that in some cases even a contract for services can be specified in a manner that would implicate the public policy underpinnings of the economic loss rule, and thus restrict a plaintiff to economic damages in contract. For instance, if a musician negotiated a contract where the terms required a performance at a certain location, on a specified date, for a certain duration, and contained provisions defining what constitutes breach and what remedies are available, it would certainly confound the reasonable expectations of the parties if that musician were later sued in tort for negligence when she failed to show up at the venue on the specified date. In opting for a case-by-case application of the economic loss rule to service contracts, the Court can apply the policy considerations articulated by Arizona courts without arbitrarily expanding the rule.

■ Turning to the parties' public policy arguments, the Court questions whether the policy supporting the economic loss rule in products and construction logically transfers into contracts for real estate agent services. The economic loss rule is premised on the sound commercial policy that parties should be free to negotiate in contract and that once a bargain is struck, the parties should be limited to contractual remedies for pure economic loss. When a party experiences solely economic loss, she has only lost the benefit of her bargain, and if the negotiated terms provide a remedy for such a loss, then she will be able to seek one. To allow one who has lost the benefit of her bargain to seek remedies outside the law of contract would confound the reasonable expectations of the contracting parties. This public policy is particularly relevant in UCC contracts where the legislature has created remedies and

gap-fillers to preserve the commercial expectations of the parties. Regarding the typical case of a contract between a real estate agent and her client, there is no evidence before this Court to provide insight into the bargaining process that may occur at the time of contract formation. Indeed, it appears reasonably likely that a client merely agrees to use the services of a broker to represent her interests in a transaction, and that the contract creating that relationship is dissimilar to the agreements seen in the products or construction areas where details are present and terms are negotiated before entering into an agreement. Without reviewing evidence relating to real estate retention agreements generally, or more specifically the one used in this case, the Court cannot assess whether the public policy of preserving the reasonable expectations of the parties would be best served by application of the economic loss rule in this case.

While both parties have made reasonable arguments based upon the somewhat contradictory case law, this Court cannot expand state law based on what amounts to merely a somewhat persuasive argument. If the court were convinced that the Arizona Supreme Court would expand the economic loss rule under these circumstances, then applying the rule to bar Plaintiffs' claim would be appropriate. However, the Court is unconvinced that, given these circumstances, the Arizona high court would greatly expand the purview of the rule beyond the two distinct areas found in the cases. Therefore, faced with a line of state precedent encompassing two decades of limited application, the Court adopts Arizona's narrow view of the economic loss rule, and finds that Plaintiffs have stated a claim for negligence against the Realty Defendants.

**IT IS ORDERED** denying Defendants John and Jane Doe Wee, Richard and Jane

Doe Hanten, and Realty Experts, Inc.'s Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 45).